James L. DODSON, Appellant/Cross–
Appellee,

v.

Robin L. DODSON, Appellee/Cross–
Appellant.

Nos. S–7386, S–7416.

Supreme Court of Alaska.

March 27, 1998.

R. Scott Taylor and Philip R. Volland, Rice, Volland, Taylor & Hensley, P.C., Anchorage, for Appellant/Cross–Appellee.

Joseph W. Sheehan, Law Offices of Joseph W. Sheehan, Fairbanks, for Appellee/Cross–Appellant.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE, and BRYNER, JJ.

## OPINION

FABE, Justice.

## I. INTRODUCTION

The issues in this appeal and cross-appeal relate to proceedings that ended Jim and Robin Dodson's marriage. Jim challenges several aspects of the superior court's property division as well as the superior court's decisions ordering him to sign a stock pledge agreement and to pay Robin reorientation alimony and attorney's fees. In her cross-appeal, Robin argues that the superior court erred in characterizing certain property as marital rather than as belonging to her separately. We reverse in part, remand in part, and affirm in part.

## II. FACTS AND PROCEEDINGS

Jim and Robin Dodson were married on September 30, 1967, separated in September 1993, and divorced in October 1995. In an order dated September 11, 1995, Superior Court Judge Mary E. Greene divided the

parties' marital assets and obligations.[1] In addition, she ordered Jim to pay Robin reorientation alimony "continuing until the earlier of the sale of the [marital residence] or Ms. Dodson becoming employed full time for the Fairbanks North Star Borough School District (or comparable job)." In connection with the divorce proceeding, Judge Greene also awarded Robin approximately $55,000 in attorney's fees and directed Jim to execute a stock pledge agreement "as security for the payment, discharge, and indemnification" of the debts awarded to him during the property division.

On appeal, Jim argues that the superior court erred in several ways when it divided the marital assets and obligations. He also asserts that the court erred in awarding to Robin $55,000 in attorney's fees and in requiring him to sign the stock pledge agreement. Robin cross-appeals, asserting that the superior court erred in characterizing certain stock as marital property rather than as her separate property.

## III. STANDARD OF REVIEW

■ In general, we review factual findings under the clearly erroneous standard. *See Barber v. Barber,* 837 P.2d 714, 716 n. 2 (Alaska 1992). We review *de novo* the application of law to the relevant facts. *See Fitzgerald v. Puddicombe,* 918 P.2d 1017, 1019 (Alaska 1996).

■ In property division cases, our goal is to determine whether the trial court abused the broad discretion given to it under AS 25.24.160(a)(4). *See Moffitt v. Moffitt,* 749 P.2d 343, 346 (Alaska 1988). The division of property by the trial court is a three-step process. *See Carstens v. Carstens,* 867 P.2d 805, 810 (Alaska 1994). "Step one—determining what property is available for distribution—is reviewed under the abuse of discretion standard, although it may involve legal determinations to which this court applies its independent judgment." *Moffitt,* 749 P.2d at 346. The second step requires the superior court to place a value on the

property. *See Carstens,* 867 P.2d at 810. This is a factual determination that we will reverse only if there is clear error. *See Moffitt,* 749 P.2d at 346. Finally, in step three the superior court allocates the available property in an equitable manner. *See id.* We review this allocation under the abuse of discretion standard. *See id.*

■ We also employ the abuse of discretion standard when reviewing the superior court's award of alimony, *see Myers v. Myers,* 927 P.2d 326, 327 n. 1 (Alaska 1996), and attorney's fees. *See Kowalski v. Kowalski,* 806 P.2d 1368, 1372 (Alaska 1991). Under the abuse of discretion standard, the trial court's decision will be overturned only if this court has "a definite and firm conviction that the judge made a mistake." *City of Kenai v. Ferguson,* 732 P.2d 184, 190 (Alaska 1987).

## IV. DISCUSSION

A. The Superior Court Erred in Requiring Jim to Pay Certain Promissory Notes Relating to the Fidelity Warehouse, Inc. and Denali Transportation Corp. Stock.

The first issue in Jim's appeal and the primary issue in Robin's cross-appeal relates to certain stock in Fidelity Warehouse, Inc. (Fidelity) and Denali Transportation Corp. (DTC). The DTC and Fidelity stocks at issue in this case were at one time owned by a trust created by Robin's father, Sig Wold (the Wold Trust). The stocks' certificates reflect that Robin and Jim, acting as trustees[2] for the Wold Trust, transferred the stock in November 1979 to "[Jim] or Robin." This transfer occurred before Sig Wold's death in 1983.

Interestingly, the record contains two promissory notes, one for $12,400 and the other for $79,300, that purport to have been executed by Jim on the same days in November 1979 when the Wold Trust transferred the Fidelity and DTC stock to "[Jim] or

---

1. All child custody issues were resolved in a bifurcated proceeding.

2. Originally, the Wold Trust named Sig Wold and Robin as trustees. However, Sig Wold amended the trust in 1977 to substitute Jim as co-trustee in place of himself.

Robin." [3] At trial, Jim initially testified that the promissory notes were consideration for and executed contemporaneously with the 1979 Fidelity and DTC stock transfers. However, following a conversation with the attorney who handled the execution of the notes, Jim recanted his earlier statements and stated that he had executed the notes well after the 1979 transfers.[4] On appeal, Jim asserts that, based upon the advice of his attorney, he backdated the notes to match the dates of the DTC and Fidelity stock transfers in order to characterize the transfers as sales so as to avoid federal gift taxes and penalties that might have otherwise applied.

As for the DTC stock, the superior court found that in November 1979 Robin knowingly participated with Jim in transferring the stock from the Wold Trust to the Dodsons as individuals. Accordingly, the court characterized the 1979 stock transfer as being "in the nature of a gift" and concluded that the DTC stock was marital property. Nevertheless, the superior court determined that it would be inequitable for Jim to "have the benefit of joint ownership of the [DTC] stock" without having to pay the promissory note with which he purported to purchase the stock. Therefore, it ordered Jim to pay the $79,300 note associated with the DTC stock.

By the time of the divorce, the Fidelity stock had been sold, and the proceeds had been consumed by the Dodson marriage. The superior court found that Robin knowingly signed the November 1979 document purporting to transfer the Fidelity stock from the Wold Trust to the Dodsons as individuals. Although the superior court did not explicitly find that this transfer was a gift, such a finding is implicit in the decision of the court for the court found that Robin had

the same knowledge concerning the Fidelity transfer that she had with respect to the Denali transfer, and that both she and Jim regarded her inheritance through the trust as a joint asset. Nevertheless, the superior court characterized the $12,400 note relating to the Fidelity stock as Jim's separate obligation (and Robin's separate asset) and ordered Jim to pay it.

### 1. *Jim's appeal*

■ On appeal, Jim argues that the superior court erred in ordering him to pay the $79,300 DTC note and the $12,400 Fidelity note. He contends that the superior court's decision to enforce the promissory notes relating to the DTC and Fidelity stock is inconsistent with the court's finding that Robin and Jim knowingly transferred the DTC and Fidelity stock in November 1979 from the Wold Trust to themselves as individuals. We agree. Once the superior court concluded that Robin and Jim knowingly participated in the November 1979 stock transfers, that it was the parties' intent to hold the stock jointly, and that the transfers were gifts from Robin to the marital estate, there was no theory under which the promissory notes would be enforceable. The promissory notes were executed well after the November 1979 stock transfers and were not consideration for the transfers.

Robin concedes that neither the Fidelity nor DTC stock transfers occurred for consideration. She also agrees that she signed the certificates purporting to make the transfers. Nevertheless, she asserts that she did not intend Jim to acquire any personal interest in the stock. Instead, Robin contends that she "assumed that transfer of the [stock] from 'Sigurd Wold and Robin L. Dodson as trustees of Sigurd Wold Trust' to 'James L.

---

**3.** The amounts of these promissory notes reflect appraised values of the DTC and Fidelity shares. The DTC stock was valued at $79,300 while the Fidelity shares were appraised at $12,400.

**4.** Record evidence indicates that the notes were executed in 1981. The amounts of the promissory notes were based upon appraisals performed by tax attorney Richard Stacheli. Stacheli did not begin advising the Dodsons until April 1981. Moreover, the text of the Fidelity appraisal states:

> Prior to this detailed analysis, it is most important to clearly understand economic conditions existing in 1979.... The North Slope Pipe Line construction had recently been completed.... The general economic downturn which the rest of the nation ... was just beginning to experience (*and which continues unabated into 1981*), had already begun in earnest in Alaska.

(Emphasis added.)

Dodson, and Robin L. Dodson,' was necessary to put James' name on the stock, since he was recently appointed to act as a co-trustee in place of Sig." [5]

■ We "will generally accept the determination of witnesses' credibility that are made by the court as a trier of fact, since the court heard and observed the witnesses first hand." *Demoski v. New,* 737 P.2d 780, 784 (Alaska 1987). The superior court concluded that Robin's testimony about her intentions in authorizing the 1979 transfer was not "completely accurate." Specifically, it found that Robin "was fully aware that property from the Trust was being transferred to the Dodsons individually." It based its finding upon the plain language of the stock transfer documents and upon evidence that Robin had actively participated in managing trust and family finances.

The superior court's findings are supported by the record. First, the stock transfer documents plainly indicate that Robin and Jim as co-trustees authorized the 1979 transfers. The absence of the title "trustee" or a similar term next to Jim's and Robin's names in the transferee portion of the documents is conspicuous and undermines Robin's position.

Second, although Jim appears to have been primarily responsible for the family's financial affairs, record evidence of Robin's past participation in the Wold Trust's business affairs supports the superior court's conclusion that Robin would have been able to understand the nature of what she was signing. For example, the record supports the superior court's finding that Robin worked "extensively" with the attorney for the Wold Trust to transfer all of Sig Wold's assets to the trust or into joint ownership with right of survivorship with her.[6] In light of the plain language of the transfer documents and evidence of Robin's past participation in the trust's affairs, we conclude that the superior court did not err when it found Robin to have been "fully aware" that she was authorizing transfer of the DTC and Fidelity stock from the Wold Trust to the Dodsons as individuals. Therefore, we reverse the superior court's decision to enforce the promissory notes against Jim as his separate debt and in favor of Robin as her separate property.[7]

### 2. *Robin's Cross–Appeal*

■ In her cross-appeal, Robin contends that the superior court erred in characterizing the DTC stock as a marital asset. She argues that the DTC stock is her separate property due to alleged fraud and breaches of fiduciary duty by Jim. We disagree.

The superior court concluded that "there was no intent to defraud." Because the superior court did not err in finding that Robin knew what she was signing, see Part IV.A.1, *supra,* it also did not err in concluding that she was not defrauded.

■ As to potential breaches of fiduciary duty, Robin correctly points out that Jim's role as a trustee and as the personal representative of Sig Wold's estate made him a fiduciary. However, even if the 1979 transfer of the DTC stock was a breach of this duty, the superior court did not err in concluding that Robin cannot successfully complain about it. As the superior court notes, a beneficiary who consents to a breach of trust generally cannot maintain an action against the trustee who breached a fiduciary duty. *See* Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 99.1, at 50 (4th ed. 1987) ("If the trustee-beneficiary does not consent to the breach of trust, he can hold the other trustees liable. If he does consent to the breach, he cannot himself complain of it . . . ."). Because the superior court did not

---

5. As noted above, the stock certificates actually purport to transfer the DTC and Fidelity stock in November 1979 to Jim "or" Robin.

6. Specifically, the record indicates that Robin handled all of Sig Wold's bills. It also contains several letters from Sig Wold's lawyer to Robin advising her about how to proceed in organizing Sig Wold's assets in the Wold Trust.

7. Because we agree with Jim that the superior court's decision to enforce the promissory notes is inconsistent with the court's finding that Robin and Jim knowingly transferred the DTC and Fidelity stock in November 1979 from the Wold Trust as gifts to themselves as individuals, we do not reach Jim's other arguments for reversing the superior court's decision to enforce the promissory notes.

err in concluding that Robin knowingly consented to the November 1979 stock transfers, see Part IV.A.1, *supra*, we conclude that Robin may not now successfully complain that the transfer amounted to a breach of Jim's fiduciary duty.[8]

Robin also argues in her cross-appeal that the DTC stock is her separate property based upon the source of funds rule. "Under [the source of funds] approach, property is classified according to the classification of the funds used to purchase it: property acquired with separate funds is separate; property acquired with marital funds is marital. Property purchased on debt is classified according to the funds used to pay off the debt. Thus it is 'acquired' over time." *Zimin v. Zimin*, 837 P.2d 118, 122 n. 6 (Alaska 1992). We have specifically declined to adopt this rule:

> It is one thing to hold that use of the source of funds rule in limited circumstances is not an abuse of discretion; it would be quite a leap from *Zimin* to hold that it must be applied in a given set of circumstances as a matter of law. We are not satisfied that such a leap would be appropriate.

*Cox v. Cox*, 882 P.2d 909, 915 (Alaska 1994).

In this case, the superior court did not apply the source of funds rule. Based upon *Cox*, we hold that this was not an abuse of discretion.

B. *The Superior Court Erred in Valuing the Alaska Culinary Management, Inc. Debt.*

The second disputed issue in this case relates to a venture named Alaska Culinary Management, Inc. (ACM). In the 1980s, the Dodsons invested in ACM, which owned and operated a restaurant in Fairbanks called Clinkerdagger's. According to Jim, the Dodsons were majority investors. Robin emphasizes that she did not want to purchase a majority of ACM.[9] Nevertheless, Robin signed a $400,000 note to Denali State Bank to facilitate the purchase, and she managed Clinkerdagger's for a period of time.

The restaurant closed in 1994, leaving significant outstanding debts. These debts included approximately $368,000 of the original $400,000 note to Denali State Bank. During the divorce proceedings, Jim filed an affidavit in which he stated that the Clinkerdagger's building space was being rented for $2,000 per month, but that "[t]his amount does not cover the $4,000 per month owed to the bank." Subsequently, however, he responded to direct examination as follows:

Q And then what about the—what was the 400,000–dollar note?

A It's being serviced by the person that we have the building at Clinkerdaggers leased to, which is Alex—the last name slipped my mind.

. . . .

Q And you say he—is he presently leasing it from you?

A Yes.

Q And then—but where do his lease payments go?

A They're paid directly to Denali State Bank.

Q And what do those lease payments pay in addition to the bank loan, anything?

A No.

Q Who pays the lease payments owed to. . . .

A Well, it's a triple-net lease. He pays that and the lease payments and the taxes.

The superior court concluded that the parties owed Denali State Bank $368,000 and awarded the debt to Jim. It also awarded all of the ACM stock to Jim. Then, for purposes of calculating the value of Jim's portion of the property distribution, the court concluded that the combined value of the ACM stock and the Denali State Bank debt was zero.

**8.** This same analysis applies to Jim's fiduciary duty as the personal representative of Sig Wold's estate. *See Gudschinsky v. Hartill*, 815 P.2d 851, 853 n. 7 (Alaska 1991) ("[T]he personal representative is liable to interested persons for damage or loss resulting from the breach of fiduciary duty to the same extent as a trustee of an express trust.").

**9.** She testified: "I didn't think maybe eight percent would be bad like everybody else was doing, but I absolutely did not want to do 51 percent."

The court reached this conclusion "because of the facts that the debt is currently serviced by the rental, the court has no information regarding the assets of Alaska Culinary Management, and the court does not believe that it is likely that Mr. Dodson would pay the entire amount by himself."

Jim challenges the superior court's conclusion. He correctly points out that "[b]oth parties testified that the ACM stock was of no value." Therefore, he focuses on the new tenant's payments and concludes that "[t]he trial court's determination that 'servicing the debt' zeroed-out the entire obligation finds no support in logic or in the record."

Robin contends that Jim's testimony supports the superior court's conclusion. She also asserts that "[t]here is no evidence of record to support [Jim's] contention that he personally will pay the Denali State Bank debt of $368,000."

We conclude that the superior court erred. There is insufficient evidence to justify the conclusion that Jim will have no liability on the Denali State Bank debt. On remand the court should determine what portion of this debt he will likely have to pay. In making this determination, the superior court is authorized to conduct supplementary evidentiary proceedings.

C. *The Superior Court Did Not Abuse Its Discretion in Discounting Jim's 401(k) Plan by a Projected Tax Liability.*

The next issue in this case involves Jim's 401(k) plan, which the parties agree had a market value at the time of trial equal to $38,500. The superior court awarded the entire plan to Robin. However, it discounted the value of the plan by $11,935 to account for tax consequences. The court's notation accompanying the tax discount reads: "assumption held w/no penalty, taxed at 31% marginal rate." To effectuate the allocation of the 401(k) plan, the court signed a Qualified Domestic Relations Order (QDRO). On appeal, Jim asserts that the court erred in calculating the value of the property equitably distributed to Robin because it reduced the value of the plan by a projected, "hypothetical" tax consequence.

To support his position, Jim cites *Oberhansly v. Oberhansly*, 798 P.2d 883 (Alaska 1990), *Money v. Money*, 852 P.2d 1158 (Alaska 1993), and *Barnes v. Barnes*, 820 P.2d 294 (Alaska 1991). These cases hold that a superior court is required to consider tax consequences relating to the distribution of a particular piece of property when there is proof of an "immediate and specific tax liability" that will result from the distribution. *Barnes*, 820 P.2d at 297; *Oberhansly*, 798 P.2d at 887; *accord Money*, 852 P.2d at 1163.

The parties dispute whether there was evidence of an "immediate and specific tax liability." We need not determine whether such a tax liability is present in this case. Regardless of whether Robin's future tax liability was immediate and specific, we conclude that the superior court did not err.

In a Virginia case, the trial court awarded the husband sixty-five percent of the value of the jointly owned marital residence. *See Barnes v. Barnes*, 16 Va.App. 98, 428 S.E.2d 294, 300 (1993). The court awarded a disproportionately large share to the husband because it ordered the husband to assume the entire liability for capital gains taxes that might arise from a future sale of the house. *See id.*, 428 S.E.2d at 300 & n. 2. The *Barnes* court affirmed the unequal division of the value of the marital residence. *See id.* at 300. It reasoned that "by noting that the husband would bear the responsibility of the capital gains tax, [the trial court] did no more than recognize what the Internal Revenue Code would require of the husband should he later sell the property." *Id.* Therefore, it determined that the trial court did not err "by considering and noting that the tax law would require the husband to pay any future capital gains tax that may become due." *Id.*

Similarly, we conclude that the superior court in this case did not abuse its discretion by recognizing that the transfer of the 401(k) plan to Robin shifted a tax liability to her. Although the precise magnitude of the tax liability may be unpredictable, the superior court did not err when it considered that Robin would have to pay deferred taxes on the 401(k) plan before she could use the plan's funds. Nor did the superior court

abuse its discretion by assuming a thirty-one percent marginal tax rate. *See Day v. Day,* 40 Ohio App.3d 155, 532 N.E.2d 201, 206 (1988) (finding that future taxes on a Keogh plan were "too speculative to be ascertained at this time" but that the trial court "properly could apply the present tax rates in considering the tax consequences" because the rate used by the trial court was not "unreasonable, even if [it is] the highest applicable rate.").[10]

D. *The Superior Court Erred in Classifying Credit Card Debt Incurred by Robin after Separation as Marital Debt.*

■ The next issue involves certain credit card debt incurred by Robin before the superior court entered temporary orders but after the parties' separation on September 26, 1993.[11] The superior court stated:

[P]rior to the time that the court entered temporary orders, substantial credit card debt was incurred by Ms. Dodson since she had no other way to support herself. The court concludes that this post-separation credit card [debt] is marital debt. Until the time of temporary orders, the parties had not ceased functioning as a separate economic unit.

The court awarded the full amount of the debt to Robin in its calculation of Robin's share of the marital property.

Jim relies upon *Ramsey v. Ramsey,* 834 P.2d 807 (Alaska 1992), and asserts that the superior court erred in characterizing the credit card debt as marital debt. We agree.

In *Ramsey,* the parties physically separated in the summer of 1988, but the trial court concluded that due to the extensive commingling of finances, "the parties continued to function economically as a single unit until

the summer of 1990." *Ramsey,* 834 P.2d at 808. Thus, the trial court divided the parties' marital assets as of May 11, 1990. *See id.*

We held that the trial court's "economic unit finding" was clearly erroneous. *Id.* We noted that the parties' permanent separation in the summer of 1988 "represented 'a final separation that [was] intended to, and [did] in fact, lead to a divorce.'" *Id.* at 809 (alteration in original) (quoting *Schanck v. Schanck,* 717 P.2d 1, 3 (Alaska 1986)). We also stated that Sandra Ramsey's "continuing economic dependence alone does not indicate the continuance of the marital economic unit." *Id.*

■ In this case, the superior court did not clearly indicate why it concluded that the Dodsons continued functioning as an economic unit until the time of temporary orders. It appears that the court based its economic unit finding upon its conclusion that between the parties' separation and the time of temporary orders, Robin "had no other way to support herself." However, *Ramsey* determines that a trial court may not permissibly conclude that parties continue to function economically as a marital unit after the date of permanent separation just because one of the parties is economically dependent upon the other. *See Ramsey,* 834 P.2d at 809. Therefore, we conclude that the superior court erred in characterizing the credit card debt as marital.[12]

E. *The Superior Court Did Not Abuse Its Discretion in Awarding Reorientation Alimony.*

■ The next issue involves the superior court's award of reorientation alimony to Robin "in the amount of $1,000 per month

---

10. We note, however, that a superior court might abuse its discretion by considering tax consequences for divorcing spouses in an inconsistent manner. For example, the court might abuse its discretion by awarding a 401(k) plan to one spouse and an Individual Retirement Account to the other spouse if it considers the tax consequences associated with the 401(k) plan only. In this case, the superior court did not consider tax consequences in an inconsistent manner.

11. The amount of the debt was approximately $10,800. Approximately $6,800 was attributable to an MBNA Mastercard. The remaining $4,000 was attributable to an Alaska Bankcard Center credit card.

12. Although we conclude that the superior court erred in characterizing the credit card debt as marital based upon the economic dependence of Robin, the court may address Robin's economic dependence by adjusting the overall property division. *See* AS 25.24.160(a)(4).

beginning October 1, 1994, and continuing until the earlier of the sale of the Skyline house or Ms. Dodson becoming employed full time for the Fairbanks North Star Borough School District (or a comparable job)." Jim argues that we should vacate the alimony award because the property distribution adequately meets Robin's needs. We disagree.

We have recognized that "[r]eorientation alimony is ordinarily appropriate only to the extent that marital property cannot be divided in a way that provides for the parties' needs." *Davila v. Davila,* 908 P.2d 1025, 1026 (Alaska 1995) (*Davila II* ). Subject to the preference for property division, we have held that reorientation alimony is appropriate where one spouse will have to live on a dramatically reduced income. *See Notkin v. Notkin,* 921 P.2d 1109, 1112 (Alaska 1996). We have also approved an alimony award "to aid the plaintiff while she is preparing to enter the job market and to organize the considerable non-liquid and non-income producing property being distributed to her from the marital estate." *Money v. Money,* 852 P.2d 1158, 1163–64 (Alaska 1993).

In this case, Robin will have to adjust to living on a teacher's salary after having been supported by Jim, whose average annual salary was over $190,000. The property division in this case may not be adequate to support her while she waits for a teaching job to become available because most of Robin's marital and separate property appears to be neither liquid nor income-producing. Indeed, the superior court indicated that the parties possessed "little liquid property" and that the "only income-producing asset owned by the parties is the stock in the Denali Group." Therefore, based upon *Notkin* and *Money,* we conclude that the superior court did not abuse its discretion in deciding to award Robin alimony.

Jim also asserts that the duration of the award is impermissibly indefinite. We disagree. We have recognized that reorientation alimony is essentially transitional in nature and "may properly be awarded only for relatively short periods of time." *Davila v. Davila,* 876 P.2d 1089, 1094 & n. 3 (Alaska 1994) (*Davila I* ). For example, we have noted that reorientation alimony is appropriate to provide temporary support "pending the sale of marital property or to enable a spouse 'to get a job appropriate to the spouse's *existing* skills.' " *Davila II,* 908 P.2d at 1027 (quoting *Davila I, 876 P.2d* at 1094 n. 3).

The superior court's alimony award closely tracks this language in *Davila II.* The alimony payments cease upon the earlier of the sale of the marital residence or Robin becoming employed as a school teacher. In addition, the record indicates that working as a school teacher would be appropriate to Robin's existing skills.[13] Therefore, the superior court's reasons for awarding alimony in this case are precisely the reasons that we endorsed in *Davila I* and *Davila II.* Under these circumstances, the superior court did not abuse its discretion.[14]

### F. The Superior Court Did Not Abuse Its Discretion in Dividing the Proceeds from the Sale of the Skyline Drive House.

The parties agreed to sell the marital home on Skyline Drive. The superior court estimated the fair market value of the home to be $650,000, but it assumed "a worst case sale of $600,000" for purposes of equitably dividing the house. From that $600,000, the court subtracted the mortgage debt, the real estate commission on the sale, and two repair bills.[15] Approximately $384,000 in net pro-

---

**13.** Robin worked as a teacher from 1970 through 1974. After 1974 she did not work for pay, although she managed at various times a toy store and a restaurant in which the Dodsons had invested. Between July 1993 and the time of trial, Robin renewed her teacher's certificate.

**14.** Jim argues that the alimony award provides Robin "no incentive to facilitate the sale of the [marital residence]." He suggests that Robin might interfere with the sale of the house so that

she can continue to receive alimony and rent-free accommodations. In context, however, it seems clear that the superior court envisioned an alimony award of relatively brief duration. Furthermore, the superior court's decision implicitly requires Robin to act in good faith.

**15.** The mortgage amounted to $191,712, and the real estate commission was $18,000. The two repair bills consisted of a $4,920 bill owed to a

ceeds remained from the projected sale. The court awarded $250,000 of this amount to Robin and $134,000 to Jim. It ordered any amount in excess of $384,000 to be divided evenly between the parties. If the net proceeds were less than $384,000, Robin would receive sixty-five percent and Jim would receive thirty-five percent.

Since the effective date of the superior court's Order for Interim Support, Jim has been making the mortgage payments on the house but Robin has had the exclusive right to live in it.[16] Judge Greene's September 11 order continues this arrangement until the parties sell the house. On appeal, Jim argues that the superior court erred in dividing the marital property because it failed to give him credit for the post-separation mortgage payments on the marital residence. He contends that this credit should have taken the form of either an award of the fair market rental value of Robin's exclusive use of the residence or of a reimbursement for any post-separation mortgage payments he made or will make.

As to those house payments made by Jim after separation but before entry of the decree of divorce, we recently rejected an argument similar to the one advanced by Jim. In *Harrelson v. Harrelson*, 932 P.2d 247, 253 (Alaska 1997), Larry Harrelson argued that the trial court erred in denying his motion to modify the divorce decree to give him credit for post-separation house payments. He asserted that his former wife's exclusive possession of the house "mandates that he be given credit." *Id.* Relying upon *Ramsey v. Ramsey*, 834 P.2d 807 (Alaska 1992), we held:

"We have required that trial courts consider payments made to maintain marital property from post separation income when dividing marital property. We have not, however, held that the spouse who makes such payments must necessarily be given credit for them in the final property division." ... The trial court explicitly addressed Larry's request for a credit for post-separation house payments. Given the parties' highly disparate incomes, the trial court did not abuse its discretion in denying the credit.

*Id.* (citations and footnote omitted) (quoting *Ramsey*, 834 P.2d at 809). In this case, as in *Harrelson*, the trial court found that there was a considerable disparity between the incomes of the parties, observing that

Mr. Dodson currently has monthly disposable income ... of $1,472 minus an unknown amount for Jimmy's college expense[s]. After the home and the Widgeon sell, Mr. Dodson's disposable income [will be] in excess of $7,000. Ms. Dodson has an expected monthly income of $1,622. Her monthly expenses total $2,926 plus an unknown amount in attorney's bills. Thus, she has a monthly shortfall, not including attorney's fees, of $1,300. After the house sells, assuming that her rent and utilities will cost $1,300 per month, Ms. Dodson will have a monthly shortfall of in excess of $1,700.

We cannot say that the superior court abused its discretion in denying Jim a credit for the payments he made to maintain the marital home prior to entry of the divorce decree.[17]

---

16. The record is not clear whether Jim made the mortgage payments between the time of separation and the date of the Order for Interim Support.

17. Notwithstanding the discretion afforded trial courts by *Harrelson* and *Ramsey*, Jim urges us to conclude as a matter of law that the superior court must give him credit for his post-separation payments and for Robin's exclusive use of the residence. He asserts that *Wood v. Collins*, 812 P.2d 951 (Alaska 1991), entitles him to such compensation. Specifically, he notes that this court has stated: "We held in *Wood* that where

repairperson and $1,381 paid by Robin to repair a well pump.

the use of marital property after separation effectively excludes the other spouse, the rules of cotenancy require payment to the marital estate of the fair market rental value for use of the property." *Rodriguez v. Rodriguez*, 908 P.2d 1007, 1012 (Alaska 1995).

This portion of *Rodriguez* mischaracterizes *Wood*. *Wood* did not involve marital property because the parties were not married. Instead, the parties lived together in a "twelve-year intimate, yet non-matrimonial, relationship." *Wood*, 812 P.2d at 952–53. Following the parties' "separation," Wood moved into a condominium that the parties had purchased while they were living together. *See id.* We concluded that the rules of cotenancy applied and noted that a cotenant is

However, this case differs from *Ramsey* and *Harrelson* in one significant respect. Here, the superior court ordered Jim to continue making the house payments after the divorce was final and until the house could be sold. Because Jim was required to make these post-decree house payments out of his share of the property division, the payments can best be characterized as an award of spousal support to Robin. In fact, the superior court implicitly treated them as such, finding them to be "both just and necessary," as required by AS 25.24.160(a)(2). The superior court reasoned that if Ms. Dodson did not continue to live in the home pending sale, "chances are that it would be more difficult to sell." The court further found that Ms. Dodson "has no funds from which to make the payment for the house" while "Mr. Dodson has such funds, as is illustrated by the calculation [for spousal support]." Given the superior court's finding that Mr. Dodson's continued payment of the mortgage pending sale of the home was "just and necessary" to fairly allocate the economic effect of divorce, it was not an abuse of discretion to order this temporary payment.[18]

### G. *The Superior Court Erred in Requiring Jim to Purchase Life Insurance.*

■ The superior court ordered Jim "to maintain sufficient life insurance to pay the marital debt naming [Robin] as beneficiary to the extent of any marital debt for which she remains liable." Jim asserts that "[t]his order is an abuse of the trial court's discretion, to the extent that it requires Jim to purchase life insurance to cover all marital debts, including those that already have sufficient security to protect Robin from any actual

financial exposure in the event of Jim's death."

Jim's arguments focus on the mortgage on the marital residence, a $180,000 debt owed to Key Bank, and debt owed by Falcon Properties, a partnership owned in part by the Dodsons. The mortgage was to be paid out of the proceeds of the sale of the house, and Jim argues that "there is more than sufficient equity to protect the Dodsons from any personal liability." Jim also contends that the Key Bank debt, which was allocated entirely to him, is "adequately secured by the Widgeon aircraft." As for Falcon Properties, the superior court did not mention any specific Falcon Properties debt. However, the court equally divided the Dodsons' partnership interest so that Robin and Jim each would retain a twenty-five percent interest. These partnership interests may have made Robin and Jim each liable for twenty-five percent of Falcon Properties' debts. Jim contends that the partnership's debts are adequately secured.

■ We conclude that the superior court erred in requiring Jim to purchase insurance for the entire amount of the Key Bank debt. Trial courts have discretion to require a party to provide security for a marital debt, whether by insurance or otherwise, to ensure that the party actually pays the marital debts allocated to him. *See* Brett R. Turner, *Equitable Distribution of Property* § 6.29, at 464–65 (2d ed.1994).

Because the court cannot affect the rights of creditors, *id.* at 464, its allocation of the Key Bank debt to Jim is effective only if Jim has sufficient assets to hold Robin harmless from any liability imposed by Key Bank. The

---

liable for the reasonable value of her use of property where that cotenant's use of the property "in fact excludes the other cotenant's use and enjoyment of it." *Id. Wood* does not require a trial court to apply these rules of cotenancy to married parties seeking a divorce.

**18.** The dissent suggests that even if Jim's house payments are appropriately viewed as spousal support, Jim should be reimbursed for at least that portion of the house payment that is applied to principal. However, because Jim's payments have been characterized as spousal support that is "just and necessary" to fairly allocate the economic impact of the divorce, reimbursement of those payments is not required under our case

law. If the superior court had structured its award of spousal support in a more traditional manner, requiring Robin to make the monthly house payment but providing for a commensurate increase in Jim's spousal support obligation, Jim would not, as a matter of law, have been entitled to a credit for payments to principal. When spousal support is "just and necessary," there is no requirement that the recipient reimburse the payor to "restore[] the status quo as of the time of the decree." Diss. at ——. In lieu of reimbursement for his spousal support payments, Jim will be entitled to a corresponding tax deduction.

Widgeon aircraft, which secures the Key Bank debt, will not necessarily be adequate to insulate Robin from all personal liability. Nevertheless, it provides adequate security for at least a portion of the Key Bank debt. On remand, the superior court may require Jim to purchase insurance to the extent that it finds that the Widgeon aircraft would not be reasonably likely to provide adequate security.

Similarly, we conclude that the superior court erred in requiring Jim to purchase insurance for the entire amount of the mortgage debt. Although the proceeds from the sale of the house might well exceed the amount of the mortgage debt, those proceeds might be inadequate should, for example, the house have to be sold after foreclosure. On remand, the superior court may require Jim to purchase insurance to the extent that it finds that the proceeds from the sale of the house would not be reasonably likely to satisfy the mortgage debt.

■ Finally, as for Falcon Properties, we conclude that the superior court erred to the extent that it evenly divided the debt, yet required Jim to purchase insurance to cover the Dodsons' entire share of the debt. The superior court does not have discretion to order Jim to purchase insurance to cover portions of the marital debt allocated to Robin.

## H. The Superior Court Must Reexamine the Overall Property Division.

■ The superior court divided the marital property unevenly. It allocated approximately $825,919 in marital property to Robin and approximately $710,254 in marital property to Jim. Jim asserts that the overall marital property division is inequitable. In particular, he contends that the real value of the marital property awarded to him is $342,254 because the superior court should have included the full $368,000 value of the ACM debt (discussed in Part IV.B, *supra*). He also argues that the superior court should have accounted for the DTC and Fidelity

promissory notes (discussed in Part IV.A, *supra*). Certainly, an uneven property division would be appropriate in this case.[19] However, in light of our conclusions in Parts IV.A–G, *supra*, the superior court should reexamine the division of the marital property to ensure that the revised property division will be equitable.

## I. The Superior Court Must Reexamine the Attorney's Fees Award.

The Order for Interim Support obligated Jim to pay $25,000 for Robin's attorney's fees and costs. Upon motion after trial, the court also ordered Jim to pay Robin an additional $30,000 in attorney's fees. The court awarded these fees after determining that Robin did not have "economic parity" with Jim and that Jim had "a substantial income in excess of $160,000 per year." On appeal, Jim argues that he cannot afford to pay $55,000 for Robin's attorney's fees and that Robin has sufficient assets to pay her own legal fees.

■ We have repeatedly stated that cost and attorney's fees awards in divorce cases are to be based primarily upon the relative economic situations and earning capacities of the parties. See Kelly v. Kelly, 926 P.2d 1168, 1170 n. 3 (Alaska 1996). If the parties have comparable economic situations and earning capacities, each party should bear his or her own costs. See Doyle v. Doyle, 815 P.2d 366, 373 (Alaska 1991). Otherwise, an award of attorney's fees is within the discretion of the trial court. See id.

We have reversed attorney's fees awards where the spouse receiving the award has a higher earning capacity, see, e.g., Lone Wolf v. Lone Wolf, 741 P.2d 1187, 1189, 1192–93 (Alaska 1987); Siggelkow v. Siggelkow, 643 P.2d 985, 989 (Alaska 1982), or where the recipient spouse is in a relatively more favorable economic situation, even though that spouse's earning capacity is lower. See Cooke v. Cooke, 625 P.2d 291, 292–93 (Alaska 1981) (per curiam).

---

19. We have noted that "[w]hen a couple has sufficient assets, the spouse with the smaller earning capacity can and should receive a larger share in the property distribution." *Dixon v.*

*Dixon*, 747 P.2d 1169, 1173 (Alaska 1987). In this case, Jim's earning capacity appears to be substantially greater than Robin's.

In this case, Jim has a significantly higher earning capacity than Robin.[20] However, our conclusions in Parts IV.A–H, *supra*, may significantly impact the parties' financial situations. Therefore, on remand the superior court should reexamine the attorney's fees award to determine whether it is appropriate in light of our rulings in this case.[21]

## V. CONCLUSION

We REVERSE the superior court's decision to enforce the promissory notes. We REVERSE and REMAND the valuation of the ACM debt, the classification of Robin's post-separation credit card debt as marital, and the superior court's decision to require Jim to purchase life insurance to cover all of the marital debts for which Robin remains liable. We also REMAND the overall property division, the attorney's fees award, and the superior court's decision to require Jim to sign the stock pledge agreement. We AFFIRM the superior court's decision to discount the award of the 401(k) plan, to award reorientation alimony, and its division of the proceeds from the sale of the marital residence.

MATTHEWS, Justice, dissenting in part.

My disagreement with today's opinion concerns only the trial court's failure to order that Jim be reimbursed for making the mortgage payments on the marital home after the decree. The court holds that such payments are best characterized as spousal support; that the trial court implicitly treated them as

such, as it found them to be "both just and necessary"; and that the trial court's determination that they were just and necessary was not error. Op. at 913.

I believe that if the post-decree mortgage payments are not to be reimbursed they are justifiable, if at all, only as spousal support. Spousal support is only proper where it is found to be both "just and necessary." AS 25.24.160(a)(2). The trial court's "just and necessary" finding does not address the possibility of reimbursing Jim for the mortgage payments he makes after the date of the decree. The payments are $3,970 each month. It would be an easy matter to order reimbursement of these payments from the house sale proceeds before dividing the proceeds. In my view, the trial court should specifically address why it is "just and necessary" that this not be done.

Further, roughly twenty-five percent of each monthly payment is principal. Failing to reimburse Jim for principal payments is error as a matter of law, as each principal payment increases net sale proceeds dollar for dollar. Ordering reimbursement of principal merely restores the status quo as of the time of the decree.

The court's response to this is that since the payments are just and necessary spousal support, reimbursement is not required. Op. 913 n. 18. This assumes as a given the question that must be answered, which is whether it is just and necessary that the payments not be reimbursed. As to principal, at least, the answer to this question is

---

**20.** According to the superior court, Jim earns approximately $160,000 per year. At the time of trial, Robin was unemployed and hoped to find a teaching position, which might pay approximately $40,000 yearly.

**21.** The final issue relates to a stock pledge agreement that the superior court required Jim to sign. The agreement requires Jim to pledge his interest in certain stock referred to as the "Denali Group Stock" "as security for the payment, discharge, and indemnification" of the DTC and Fidelity promissory notes, the ACM debt, a $22,-000 debt owed to Hub Foods, and a $7,000 loan from Denali State Bank. On appeal, Jim argues that the debts allocated to him by the superior court and secured by the pledge agreement are so large in relation to his income that the pledge agreement virtually guaranteed that he would lose his interest in the Denali Group Stock.

Thus, because his interest in that stock was one of the most valuable assets he received in the divorce proceedings, he asserts that the superior court erred in ordering him to sign the pledge agreement because it "effectively undermined [the superior court's] entire property distribution."

This argument appears to hinge upon a conclusion that the overall property division unreasonably burdens Jim (see Part IV.H, *supra*). Therefore, when the superior court reexamines the overall property division pursuant to Part IV.H, *supra*, it will avoid the harm alleged by Jim if it successfully divides the parties' debts and assets in an equitable fashion. On remand, the superior court should determine whether the stock pledge agreement unreasonably burdens Jim in light of the revised property division.

clearly "no" because there is no need to give Robin sale proceeds which have been increased by Jim's principal payments. Failing to reimburse Jim for his principal payments does just that.[1]

---

1. In the decree, the court assumed "a worst case sale" which would result in net proceeds of $384,000. These would be divided by awarding $250,000 to Robin and $134,000 to Jim. Any amount in excess of $384,000 would be divided evenly between the parties. If Jim pays the mortgage down by $20,000 and thus increases the net proceeds by $20,000, Robin would be awarded $260,000 and Jim would be awarded $144,000. Robin's net recovery would therefore be increased by $10,000 solely due to Jim's principal payments. This result is $10,000 more than is just from Robin's standpoint, and $10,000 less than is just from Jim's standpoint, given that the decree is fair and just. It is not necessary because reimbursement from the sale proceeds could be ordered.