NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JOSEPH VANN RIGGS III, )<br><br>        Appellant, )<br><br>    v. )<br><br>AMBER DAWN MASON-RIGGS, )<br><br>        Appellee. )<br>        ) | Supreme Court No. S-18658<br><br>Superior Court No. 3AN-19-09136 CI<br><br>MEMORANDUM OPINION<br>AND JUDGMENT*<br><br>No. 2066 – January 2, 2025 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Jack R. McKenna, Judge.

Appearances: Joseph Vann Riggs III, pro se, Anchorage, Appellant. No appearance by Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, and Pate, Justices. [Henderson, Justice, not participating.]

## I.    INTRODUCTION

A husband appeals various aspects of the superior court's property division as well as the court's determination that he violated a domestic relations standing order. We vacate the property division because the marital home was not valued correctly. However, we affirm the superior court's valuation of the remaining property at issue. We also affirm the court's finding that the husband violated the domestic relations standing order.

---

\*        Entered under Alaska Appellate Rule 214.

## II. FACTS AND PROCEEDINGS

Joseph Riggs III (Joe) and Amber Mason-Riggs married in July 2004 and separated in July 2019.[1]

Amber is a chiropractor. She owns and operates her own chiropractic practice, Back In Motion, LLC. She is the business's sole chiropractor. Although Amber previously maintained a standalone practice, she now subleases office space from another chiropractic business.

Joe has had a number of different careers. He was most recently employed by Merrill Lynch as a financial advisor, but testified that as of May 2022 he was unemployed.

Amber filed for divorce in August 2019. The superior court held a property trial between April and June of 2022. Amber was represented by counsel. Although Joe had been represented by three different attorneys during the pretrial phase, he was not represented at trial.

The parties disputed the value of the marital home. The court found that two Comparable Market Analyses (CMA) of the home's fair market value prepared by Amber's expert were more credible than the appraisal prepared by Joe's expert. The court then subtracted $136,700 from the earlier of the two CMA figures to account for the cost of repairs that a contractor (presented by Amber as an expert witness) testified were necessary to make the home marketable.

The parties also disputed the value of Amber's business. The court found Amber's evidence more reliable. The court found that Back In Motion's book of business was entirely based on Amber's personal goodwill and therefore had no independent value. The court concluded that Back In Motion had a value of -$5,793.44 because its "credit card balance outweighed the value of any tangible assets at the time

---

[1] The parties have two minor children, but custody is not at issue in this appeal.

of separation" and Amber's limited ability to work due to injuries and childcare needs further diminished the business's value.

The court valued Amber's retirement account at $131,452.73. Finding credible Amber's testimony that she would need to liquidate the account in order to pay her attorney, the court also awarded her "the debt related to the tax consequences of cashing out" the account: -$44,693.92.

The court found that Joe violated its initial domestic relations standing order when he failed to renew health insurance coverage for Amber while the divorce was pending. Joe argued that he acted on the advice of his attorneys, but the court nevertheless held him responsible. The court accordingly ordered Joe to reimburse Amber $7,946 for healthcare expenses she incurred while uninsured.

The court determined that a 50/50 division of the marital estate was warranted based on the parties' relative financial conditions. The court awarded Amber the marital home, Back In Motion, her retirement account, and various personal property. The court awarded Joe a cash account, a retirement account in his name, and various items of personal property. The court also ordered Joe to pay Amber an equalization payment in the sum of $30,139.45.

Joe, representing himself, appeals. Amber does not participate in the appeal.

## III. DISCUSSION

Joe appeals four aspects of the superior court's divorce order: (1) the valuation of the marital home, (2) the valuation of Amber's retirement account, (3) the valuation of Back In Motion, and (4) the determination that Joe's failure to add Amber to his new health insurance policy violated the domestic relations initial order.

### A. We Reverse The Valuation Of The Marital Home.

"Division of marital property involves three steps: (1) deciding what specific property is available for distribution, (2) finding the value of the property, and

(3) dividing the property equitably."[2]  "The second step, the valuation of property, is a factual determination that we review for clear error."[3]  "[W]hether the trial court applied the correct legal rule . . . is a question of law that we review de novo using our independent judgment."[4]

> ### 1. It was error to reject the most current evidence of the home's value without explanation.

Joe argues that Amber's expert's testimony contained "obvious, major flaws" and demonstrated bias, and that the superior court erred in valuing the marital home based on her CMAs.

Joe does not convince us that the superior court clearly erred in finding Amber's expert more credible than his expert.  "In evaluating the relative credibility of witnesses, the court ordinarily has no obligation to accept expert testimony when it finds other evidence more persuasive; nor is the court bound to favor the testimony of an ostensibly neutral witness who is unconvincing over that of a witness who testifies convincingly despite circumstances suggesting potential bias."[5]  Moreover, "it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[6]  Joe argues that Amber's expert witnesses deliberately skewed their testimony to advance Amber's interests as well as their own.  And he contends that his expert's testimony as to the value of the home was more accurate.  The superior

---

[2]     *Aubert v. Wilson*, 483 P.3d 179, 186 (Alaska 2021) (internal quotation marks omitted) (quoting *Thompson v. Thompson*, 454 P.3d 981, 988 (Alaska 2019)).

[3]     *Id.* (quoting *Pasley v. Pasley*, 442 P.3d 738, 744 (Alaska 2019)).

[4]     *Id.* (alterations in original) (quoting *Grove v. Grove*, 400 P.3d 109, 112 (Alaska 2017)).

[5]     *Evans v. Evans*, 869 P.2d 478, 480 (Alaska 1994) (footnote omitted).

[6]     *Fink v. Mun. of Anchorage*, 379 P.3d 183, 192 (Alaska 2016) (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009)).

court found otherwise, and Joe does not persuade us the court was clearly wrong to do so.[7]

However, having accepted Amber's expert's CMAs, the court erred by accepting the older of the two without explaining why. In valuing marital property, the superior court should rely on evidence that indicates the property's value as close to the time of trial as practicable.[8] "[T]here may be special situations in which the date of separation is more appropriate," but "the court must make specific findings in such cases as to why the use of this date is proper."[9] Amber's expert valued the home at $455,280 in November 2020 and $468,000 in June 2022. Amber's written closing argument urged the court to value the marital home as reflected in the CMA from 2020, near the time of separation. The court ultimately did so, finding that "the CMAs . . . more accurately reflect the value of the home" than Joe's expert's appraisal. But the court did not explain why it chose to adopt the earlier of the two CMAs. Because the court did not explain its decision, it was error to value the home based on the 2020 CMA instead of the 2022 CMA. Indeed, Amber's expert testified that the housing market had "increased in Anchorage pretty drastically" between November 2020 and June 2022, suggesting the later CMA was a more accurate estimate of the home's value at the time of trial.

### 2. It was not clear error to deduct the cost of repairs a contractor deemed necessary from the home's fair market value.

Joe argues that the superior court erred by deducting $136,700, the cost of repairs a contractor testified were necessary to make the home marketable, from the

---

[7]     *See id.*

[8]     *Cox v. Cox*, 882 P.2d 909, 917 (Alaska 1994) (citing *Ogard v. Ogard*, 808 P.2d 815, 819 & n.8 (Alaska 1991)).

[9]     *Id.*

CMA estimate of Amber's expert, which the court found credible. We cannot say the court's decision to do so was plain error.

"In valuing a marital asset, the court should look to the asset's fair market value."[10] "[F]air market value is a single, unitary figure."[11] Black's Law Dictionary defines fair market value as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction."[12]

In this case Amber's expert prepared a CMA by comparing the house to other properties in the vicinity. The expert spent "at least an hour" in the home. Based on her observations during this time, she testified that the property seemed structurally sound, but needed various repairs to fetch the best possible offer. As noted above, she valued the home at $455,280 in November 2020 and $468,000 in June 2022.

The expert's testimony is somewhat ambiguous on whether her estimate reflected the fair market value of the home in its current condition. On the one hand, she testified that "[i]f [she] were to list the property right now in its current condition," she would list it at $475,000, close to CMA estimates. But when asked whether the repairs would need to be completed before the buyer would pay that price, she did not give a clear answer. She stated:

> I think this is a situation where it would depend on how the property was marketed. . . . A property where the seller would be willing to do repairs, we would have to negotiate — my recommendation at that point, that Amber address all of the health and safety — additional repairs, which would be, likely, finishing the bathroom, the fogged window, the leaking skylight, installing (indiscernible). I would say to focus on things like the electrical — anything in the heating, the HVAC room, the laundry room.

---

[10] *Nelson v. Jones*, 781 P.2d 964, 970 (Alaska 1989) (citing *Richmond v. Richmond*, 779 P.2d 1211, 1214-15 (Alaska 1989)).

[11] *Doyle v. Doyle*, 815 P.2d 366, 370 n.6 (Alaska 1991).

[12] *Fair Market Value*, BLACK'S LAW DICTIONARY (12th ed. 2024).

The expert also testified that "if it's an as-is sale looking for a cash buyer, [the issues needing repair] may be able to be left in their current state," but if she were to "ask top dollar" and market the property for buyers "with more than just cash," she would ask that the repairs be completed before listing. This testimony could be interpreted to mean that she would list the property at much more than the CMA estimate if the needed repairs were performed before listing. But it also can be interpreted to mean that she would negotiate a substantial discount below asking price for a cash buyer willing to take the property as-is. Her CMA report lends some support to the latter interpretation — the comparable properties all were sold with conventional financing rather than cash offers.

Given the ambiguity in the testimony, we are not left with a definite and firm conviction that the superior court made a mistake in discounting the CMA estimate by the value of necessary repairs.

### B. The Superior Court Did Not Err By Deducting From The Retirement Account Awarded To Amber The Expected Tax Liability For Cashing Out The Account To Pay Her Attorney's Fees.

The superior court awarded Amber the full value of a retirement account in her name, valued at $131,452.73. The court then allocated her a debt of $44,693.92, representing the predicted taxes she would have to pay upon cashing out the account early. The court did so because it found credible her assertion that she needed to liquidate the entire contents of the account to pay over $100,000 in outstanding attorney's fees. We review the superior court's equitable allocation of marital property for abuse of discretion and "will reverse only if the division [was] clearly unjust."[13]

Joe argues that it was improper for the court to account for the tax consequences Amber would trigger by cashing out the account early "unless there was

---

[13] *Thompson v. Thompson*, 454 P.3d 981, 989 (Alaska 2019) (alteration in original) (quoting *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015)).

proof that the Court's division of the property would create the taxable event." He cites our decision in *Oberhansly v. Oberhansly*[14] to support his position. There we explained that the trial court "is not required to speculate on or to consider tax consequences in the absence of proof that a taxable event will occur in connection with the division of property."[15] But we prefaced that statement by declaring that "[w]here the trial court orders that property be distributed in a way that creates an immediate and specific tax liability, . . . the court is required to consider that liability."[16]

Although hypothetical tax consequences are not a permissible consideration when the superior court values and distributes property, it is within the court's discretion to account for a tax liability that appears inevitable.[17] In *Dodson v. Dodson* the superior court awarded one spouse's 401(k) plan to the other spouse in the course of divorce proceedings, but discounted the value of the plan to account for taxes the receiving spouse would have to pay to draw funds from the plan.[18] On appeal the other spouse, citing *Oberhansly*, argued that the court erred in its valuation by discounting the plan's value by this "hypothetical" tax consequence.[19] We held that the superior court did not abuse its discretion by recognizing that transferring the plan shifted a tax liability to the receiving spouse and discounting the plan's value to reflect that.[20]

*Dodson* supports the superior court's approach in this case. The facts of *Dodson* differ somewhat from the situation here because the tax liability for the

---

[14]    798 P.2d 883 (Alaska 1990).

[15]    *Id.* at 887.

[16]    *Id.*

[17]    *See Dodson v. Dodson*, 955 P.2d 902, 909 (Alaska 1998).

[18]    *Id.*

[19]    *Id.*

[20]    *Id.* at 909-10.

receiving spouse in *Dodson* was unavoidable,[21] whereas Amber could avoid an early withdrawal penalty by waiting until retirement age to access the account. But like the court in *Dodson*, which made assumptions regarding the amount of taxes the receiving spouse would pay on her 401(k) distributions,[22] the superior court here made assumptions regarding the high likelihood that Amber would need to cash out her retirement account to pay over $100,000 in attorney's fees. These assumptions were reasonable because Amber credibly testified that she intended to imminently liquidate the account to pay her attorney, which was necessary because she did not have sufficient funds to do so otherwise. The superior court did not abuse its discretion by accounting for the tax liability that would result.

Joe argues that Amber did not need to liquidate her retirement account and incur the associated taxes because she sold the marital home in June of 2023 and could use the proceeds to pay her attorney. Joe's argument is not persuasive. First, Joe fails to point to any evidence in the record that supports his assertion. But even if evidence of the home's sale were properly before us, the proceeds Amber would have netted likely would not have been so substantial as to eliminate the need to liquidate her retirement account. As discussed above, the fair market value of the home at the time of trial was around $460,000. When the superior court issued its order, the home was subject to a mortgage totaling more than $350,000. Upon selling the home, Amber would have needed to secure new housing for her and the children and likely would have needed to use the proceeds to pay for it. Therefore, any surplus funds generated by selling the home would likely not have been enough to cover over $100,000 in outstanding attorney's fees. We are not convinced by Joe's argument.

---

[21]    *See id.* at 909 (noting that receiving spouse "would have to pay deferred taxes on the 401(k) plan before she could use the plan's funds").

[22]    *See id.* at 909-10.

Nothing in the record indicates that the superior court was incorrect to consider Amber's attorney's fees in discounting the value of her retirement account. The court declined to rule on attorney's fees in its order. It indicated that it would address the matter once all pending issues in the case were resolved. When the court issued its property order a custody modification trial was still pending. If, after the custody trial concluded, the court orders Joe to pay all or most of Amber's fees, that might undercut the need for Amber to empty her retirement account to fund the divorce litigation. In that event, Joe could move for relief from judgment under Alaska Civil Rule 60(b).[23] However, on the record before us, we see no error in the court's order. We therefore affirm.

C. **The Superior Court Did Not Clearly Err By Using Older, More Reliable Evidence To Value Amber's Business.**

Joe argues that the superior court clearly erred in assigning Back In Motion a negative value. He contends that the court erred by rejecting his expert's appraisal of the business and relying instead on Amber's more dated and incomplete evidence of value. Although Joe is correct that, as a general matter, trial courts should value marital property to reflect the property's value as close to trial as is practicable, we see no error in the court's valuation of Back In Motion.

The parties painted very different pictures of the business's value. Amber provided a balance sheet from July 11, 2019, as the best evidence of Back In Motion's value. The balance sheet showed that Back In Motion's debts exceeded its equity by $5,793.44 at that time. Amber also provided a report showing the business's profits and losses from January through December 2021. Joe's expert conducted an appraisal of the business in April 2022. Because Joe's expert did not have access to the business's financial statements for 2021, his appraisal valued Back In Motion as of December 31, 2020. The report valued the business at $129,900, largely based on the value of Back

---

[23] Alaska R. Civ. P. 60(b).

In Motion's book of business. Amber countered that conclusion with expert testimony from another Anchorage chiropractor indicating that her book of business was not a marketable asset in the local chiropractic industry.

The superior court valued Back In Motion at -$5,793.44. The court's valuation was based on several findings. First, the court found that Amber's evidence as to the business's value was more credible than Joe's. The court found Joe's expert "credible to the extent that his assumptions were true," but found that his assumptions "were based solely on how [Joe] viewed the business," which was not entirely accurate. Second, the court determined that Back In Motion's book of business was not a marketable asset. The court found that the book of business was "based solely on [Amber's] personal goodwill" and therefore had no fair market value.[24] Third, the court determined that Back In Motion's "credit card balance outweighed the value of any tangible assets at the time of separation," and therefore the business itself had a negative value. Fourth, the court found that limitations in Amber's ability "to work due to injuries and childcare needs" supported the modest valuation.

Because the superior court found Joe's expert's appraisal not credible, it could rely on Amber's evidence, even though it was less current.[25] Moreover, the 2021 profit and loss report Amber provided was evidence of value closer in time to the date of trial that further supports the court's findings. In sum, the superior court did not err in valuing Amber's business.

---

[24] *See Moffitt v. Moffitt*, 749 P.2d 343, 347-48 (Alaska 1988) (explaining that if trial court determines business good will is unmarketable it should not be considered in dividing marital assets).

[25] *See Ogard v. Ogard*, 808 P.2d 815, 819 (Alaska 1991) (explaining that property should be valued "as close as practicable to the date of trial"); *Beals v. Beals*, 303 P.3d 453, 462 (Alaska 2013) (recognizing earlier valuation date may be appropriate "when a later valuation date [is] less reliable").

**D.** **The Superior Court Did Not Err In Finding That Joe Violated A Domestic Relations Standing Order By Not Renewing Amber's Health Insurance Coverage.**

Joe argues the superior court erred by requiring him to reimburse Amber for the cost of a surgery she had after separation. The court did so because it found that Joe violated a domestic relations standing order by leaving Amber off his insurance when he obtained a new policy. Joe argues he did not violate the order because he took this action on the mistaken advice of counsel, but the court did not accept this excuse. We see no error in the court's ruling.

The superior court issued a domestic relations standing order in August 2019. The order provided that Joe could not "cancel, change or stop paying for any insurance policy." Joe's insurance, covering Amber and their sons, expired in late 2019. Joe testified that he asked his attorneys whether the order required him to add Amber to any new policy he applied for. According to Joe, his attorneys informed him that this was not necessary. Relying on this advice, Joe did not add Amber to his new policy.

Amber underwent knee surgery in October 2020. Because she was not covered by Joe's new policy, Amber was uninsured at the time. She incurred $7,946 in out-of-pocket healthcare costs as a result.

The superior court granted Amber's request that Joe reimburse her for her out-of-pocket medical costs. The court found Joe's testimony about his reasons for not adding Amber to his new insurance policy not credible. It found that Joe "willfully removed [Amber] from the policy when he should have included her during open enrollment."

On appeal Joe seems to argue that it was error for the superior court to find that he violated the domestic relations standing order because his failure to add Amber to his new insurance policy was merely a product of incorrect legal advice. He also maintains that when he tried to rectify the issue, Amber unreasonably obstructed his attempts to do so.

These arguments are not persuasive. The superior court was under no obligation to find Joe's testimony credible.[26] And even if Joe did act in reliance on bad advice from his attorneys, he does not point to any law suggesting he cannot be held responsible for acts taken on advice of counsel. Moreover, even assuming that Amber was uncooperative when Joe attempted to reinstate her coverage, this does not undermine the superior court's finding that Joe violated the order when he let her coverage lapse.

The standing order clearly provided that Joe could not "cancel, change or stop paying for any insurance policy." And it made clear, in bold text, that should either party violate the order, the court could "order sanctions," including fines. The trial court has discretion to impose appropriate sanctions when a party violates a domestic relations standing order.[27] We see no error in the court's conclusion that Joe violated the domestic relations order in this case when he failed to add Amber to his new insurance policy. Nor do we see any error in the court's exercise of its discretion by requiring Joe to reimburse Amber for the medical costs she incurred as a result of his violation of the order.

## IV. CONCLUSION

We VACATE the superior court's property division and REMAND with instructions to value the marital home in accordance with this opinion. We AFFIRM the court's order in all other respects.

---

[26] *See Fink v. Mun. of Anchorage*, 379 P.3d 183, 192 (Alaska 2016) ("[I]t is the function of the trial court . . . to judge witnesses' credibility and to weigh conflicting evidence." (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009))).

[27] *See, e.g.*, *Butts v. LeMaster*, No. S-18367, 2024 WL 955834, at *7-8 (Alaska Mar. 6, 2024).