DAY, APPELLEE, *v.* DAY, APPELLANT.

156

(No. 87AP-768—Decided
March 31, 1988.)

George W. Gross, Jones, Day,
Reavis & Pogue, Robert M. Duncan
and Maryann B. Gall, for appellee.

Jeffrey A. Grossman, Co., L.P.A.,
and Jeffrey A. Grossman, for appellant.

BRYANT, J. Defendant-appellant, Evelyn Joyce Day, appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, granting a summary judgment of divorce to plaintiff-appellee, Roger F. Day, upon grounds that the parties had lived separate and apart for one year. At that time, the court reserved judgment on the questions of property division and sustenance alimony. Thereafter, both parties presented the court with trial briefs which detailed the evidence that might have been introduced at a trial. The court filed a written decision on December 30, 1986, setting forth a property division and an award of sustenance alimony. Defendant's motion for a new trial was denied by the court on June 19, 1987, and defendant appealed, setting forth four assignments of error concerning the lower court's division of property and award of sustenance alimony:

"1. The trial court erred by applying a rule that the unilateral abandonment of the marital residence by one spouse constitutes a 'de facto' termination of the marriage so that all property acquired subsequent to abandonment is non-marital and not subject to an equitable division.

"2. The trial court erred in valuing the appellee's 'Jone [sic], Day, Reavis & Pogue Pension Plan.'

"3. The trial court erred and abused its discretion in valuing appellee's Porter, Wright, Morris & Arthur Keogh Plan.

"4. The trial court abused its discretion in creating a support alimony award which is wholly insufficient."

The parties were married for approximately thirty-one years. They had one child, emancipated at the time of the divorce. Although both parties graduated from law school, defendant assumed the role of homemaker for the family and never practiced law. Plaintiff pursued a career in law, eventually becoming a partner in first one, and then another major Columbus law firm. The lower court characterized the parties' lifestyle as "upper middle class."

On September 1, 1984, plaintiff vacated the marital residence and established his own residence. Although plaintiff made periodic payments to defendant after this separation, the parties never reunited. On December 31, 1985, plaintiff filed a complaint for divorce.

In her first assignment of error, defendant contends that the lower court erred in adopting plaintiff's contention that property acquired by him after the separation is non-marital property.[1] Although the court supported its determination by deeming the day the parties separated as the

---

[1] Plaintiff's annual gross income as a partner appears to have exceeded $250,000 for 1984 and 1985.

"*de facto* termination" of the marriage, defendant suggests that plaintiff's unilateral decision to separate cannot render as non-marital any property acquired thereafter by the parties. Rather, defendant suggests that an objective measure of the end of the marriage should be used, such as the filing of the divorce complaint or the execution of the separation agreement. Plaintiff responds by characterizing marriage as a "partnership" to which the parties contributed their "joint efforts": since post-separation income is not the result of the joint efforts of the parties, plaintiff contends that the trial court properly decided to regard that property as non-marital.

The Ohio Supreme Court addressed the effect of separation on the division of marital assets in *Berish* v. *Berish* (1982), 69 Ohio St. 2d 318, 23 O.O. 3d 296, 432 N.E. 2d 183. In that case, the parties had permanently separated, and thereafter the husband withdrew the balance of the parties' joint savings account for his own use. The trial court recognized, and the Supreme Court affirmed, the value of the joint account as of the time of the separation and awarded the wife an equitable share of that value. Although the case before us does not concern economic misconduct, it does involve a similar issue: characterization of property as marital or non-marital during "the time when the parties were permanently separated and awaiting the formal termination of their marriage * * *." *Id.* at 319, 23 O.O. 3d at 297, 432 N.E. 2d at 184.

In resolving the issue, however, the Supreme Court expressly refused to lay down "any unworkable rules" by which to determine "the precise date upon which any marriage irretrievably breaks down * * *." *Id.* at 320, 23 O.O. 3d at 297, 432 N.E. 2d at 184-185. While the Supreme Court recognized that marriage is a "shared enterprise or joint undertaking," or in other words, a "partnership," it also recognized that "the contributions and equities of the partners do differ from individual case to individual case." *Id.* Likewise, the contributions and equities of the partners do not necessarily end upon their permanent separation. For example, one spouse may continue to manage marital assets, to care for the marital residence or to care for the couple's children during the divorce process. See *Riemenschneider* v. *Riemenschneider* (Dec. 30, 1986), Franklin App. No. 86AP-387, unreported. Indeed, *Berish* states:

"Equity may occasionally require valuation as of the date of the *de facto* termination of the marriage. The circumstances of a particular case may make a date prior to trial more equitable for the recognition, determination and valuation of relative equities in marital assets. * * *" *Id.* at 320, 23 O.O. 3d at 298, 432 N.E. 2d at 185.

As reflected by the foregoing passage, equitable considerations, not any flat rule, dictate the court's determination of a date prior to trial for the purpose of recognizing and valuing marital assets.

Applying the logic of the *Berish* case to the facts herein, plaintiff apparently thought the marriage was over when he vacated the marital residence, and this led the trial court to determine that the separation was a *de facto* termination of the marriage. After quoting extensively from *Berish* and from certain other cases, the trial court stated:

"Upon consideration of the foregoing cases and the historical development of statutory and case law, the Court finds that:

"(1) All property acquired by the parties after separation (i.e. *de facto* termination of the marriage) shall be regarded as non-marital property * * *."

The trial court thereby set down a flat rule, based upon statutory and

case law and not the facts of this case, that the permanent separation of the parties necessarily renders all property acquired thereafter not subject to equitable distribution. In so doing, the trial court put undue emphasis on the plaintiff's unilateral actions.

Rather, in determining a date for division and valuation of property, the trial court should commence with the date the marriage is judicially terminated and make adjustments therefrom either as to property to be included or as to the value of included property, as equitable considerations may require. Generally, however, even for division of property purposes, a marriage is terminated only upon a decree being entered by a court of competent jurisdiction. As plaintiff contends, there may be a *de facto* termination for alimony purposes prior to that date. However, such *de facto* termination must be clear and bilateral, not unilateral, as here, and can be manifested by a written separation agreement under R.C. 3103.06. In this case, the record contains no clear evidence that would support a *de facto* termination on September 1, 1984, the date plaintiff vacated the marital residence, as plaintiff's unilateral action is insufficient herein to achieve that end.[2]

Defendant's first assignment of error is sustained.

Defendant's second and third assignments of error concern the valuation of plaintiff's pension and Keogh plans. Shortly before the parties were separated, plaintiff changed law firms. The Keogh plan at his former law firm ("Porter, Wright plan"), to which no more contributions could be made, had an accumulated principal of approximately $177,000 as of August 1986.

When plaintiff changed law firms, he began participating in the pension plan at his new firm (the "Jones, Day plan"). Defendant's trial brief included a description of the Jones, Day plan, a defined-benefit plan. According to the description, a retired partner is entitled to a certain percentage of his average annual dollar participation in the firm's income for the years preceding his retirement. A part of that benefit is paid by the partner's "constructive Keogh plan," to which the firm makes annual mandatory contributions on behalf of the partner. To the extent that the constructive Keogh plan's income is insufficient to meet the retired partner's entitlement, the firm pays the retired partner the difference out of current earnings. The description also indicated the retired partner's defined benefit would be reduced proportionately by the number of months that the partner's service to the firm fell below twenty-five years. In addition to a description of the plan, defendant introduced evidence that the plaintiff was awarded a credit of nine years of service when he joined the firm. Thus, assuming the plaintiff retired at age sixty-five, he would be entitled to a twenty-year proportion of the defined benefit even though he had actually served only approximately eleven years.

Neither party presented any evidence as to the present value of the benefits to be received from the Jones, Day plan. The trial court valued the Jones, Day plan based solely on the amount of contributions accumulated in plaintiff's constructive Keogh account as of December 1984, approximately $18,000.

Defendant in her second assignment of error argues that the lower court greatly undervalued the value of plaintiff's Jones, Day pension plan.

---

[2] Of course, equity also would require that a court consider the amount of financial support given from one spouse to another during the separation.

She contends that the trial court should have entered a "qualified domestic relations order" ("QDRO") which would have required the Jones, Day plan to pay a certain percentage or amount of the benefits to her. See Section 1056(b), Title 29, U.S. Code.

Use of a QDRO could provide a fair resolution to division of plaintiff's pension asset by allocating the risks and contingencies inherent in uncertain future events and by eliminating the need for the trial court to reserve jurisdiction to divide the pension interest when and if plaintiff begins to withdraw funds from the plan. However, the trial court apparently did not consider a QDRO, even to the point of examining the plaintiff's plan to determine whether it properly could be subject to a QDRO.

Rather, the trial court erred in simply valuing the Jones, Day plan by reference to the amount of contributions made to the constructive Keogh part of the plan. The balance in plaintiff's constructive Keogh account represents only a small fraction of the anticipated value of and income from the Jones, Day plan: a retired partner is entitled to a certain level of compensation, only a part of which may be offset by the funds from the constructive Keogh account. Further, given that plaintiff received nine years of service credit when he began the plan, the one-year's contribution therein does not even represent the current value of the plan to plaintiff.

Defendant suggests that, if the QDRO is not ordered, at the least the trial court should have reserved its jurisdiction pursuant to *Blair* v. *Blair* (1983), 11 Ohio App. 3d 117, 11 OBR 171, 463 N.E. 2d 423. Thereby, when and if the Jones, Day pension benefits are received, the trial court then may reassess the situation to determine whether changed circumstances require modification of the alimony awards. Alternatively, the trial court could have determined to what portion of the retirement benefits represented by the plan defendant is entitled, when and if they are paid to plaintiff. See *Kaechele* v. *Kaechele* (1988), 35 Ohio St. 3d 93, 97, 518 N.E. 2d 1197, 1201, fn. 2. In any event, either the QDRO, if available, or the foregoing alternatives for apportioning plaintiff's plan are more equitable than the unreasonably low value the trial court placed on the plan and then employed in determining the division of property between the parties. As a result, the trial court abused its discretion in failing to consider and employ one of the alternatives discussed herein.

Defendant's second assignment of error is sustained.

Defendant's third assignment of error concerns the value the trial court placed on plaintiff's Porter, Wright Keogh plan based upon the taxability of those funds upon withdrawal. The court discounted the value of the Porter, Wright plan by thirty-five percent to take into account, it appears, federal and state tax rates.

Tax consequences of property division and sustenance alimony awards are proper considerations for the court, so long as those consequences are not speculative. For example, if the award is such that, in effect, it forces a party to dispose of an asset to meet obligations imposed by the court, the tax consequences of that transaction should be considered.

In the matter before us, not only did the court's award in no way require plaintiff to withdraw the funds from the Keogh plan, but in addition, the tax consequences at the time plaintiff withdraws funds from the plan are too speculative to be ascertained at this time. While death and taxes are said to be certain, the court had no way of knowing what the pertinent tax rates would be when the amounts are with-

drawn, five, ten, or fifteen years hence, what the progressive tax rates might be, or into which tax bracket the defendant's taxable income total might fall. Plaintiff's ability to control the timing of withdrawal from the plan adds further uncertainty to this problem.

Nonetheless, in this matter, the trial court properly could apply the present tax rates in considering the tax consequences relative to the Keogh plan. Given the current tax rates, we cannot say that the rates applied by the trial court are unreasonable, even if they be the highest applicable rate. Since the trial court's determination of tax rates was within the bounds of its discretion, we overrule defendant's third assignment of error.

Finally, defendant in her fourth assignment of error challenges the court's award of sustenance alimony. The court awarded defendant $1,200 per month, for six years. Defendant argues that, given plaintiff's very large income, this award is unreasonable.

The property-division award left defendant with a significant amount of wealth, approximately $460,000 in assets. Further, she was awarded her separate assets, having a value as determined by the lower court, of $361,000. In short, as a result of the trial court's decision, defendant held approximately $820,000 of assets after the property division, approximately $690,000 of which were liquid assets.[3] The remaining approximately $130,000 of defendant's property award was the parties' residence, which was subject to a minimal outstanding mortgage debt.

In addition to defendant's separate wealth, the court also recognized defendant's expectancies. At the time of the divorce, defendant had two separate pension interests. At age sixty-two, defendant will be eligible to receive social security income of $3,360 annually. Similarly, upon her mother's death, defendant will receive a pension from her mother's former employer, conservatively valued at $11,000 per year. Further, defendant stood to receive a sizeable six-figure inheritance from her mother. Although defendant's mother's death was not an impending event, the court recognized that her life expectancy was about six years.

Certain factors, it should be noted, weighed in favor of the sustenance alimony: the long duration of the marriage, defendant's contribution to the marriage as a homemaker, defendant's age, and her limited employability outside the home. Defendant submitted a list of her monthly expenses, totaling approximately $26,000 per year. She later submitted a revised list, totaling approximately $37,000 per year.

The amount of sustenance alimony, and the duration thereof, depend upon the needs of the dependent spouse. *Wolfe* v. *Wolfe* (1976), 46 Ohio St. 2d 399, 414, 75 O.O. 2d 474, 482, 350 N.E. 2d 413, 423. Defendant's wealth, after the court's division of property, was extensive. Safely invested, defendant's assets could produce a gross income of over $35,000 a year.[4] The foregoing, plus $14,400 in alimony, yields nearly $50,000 annually to defendant, an amount which approximates or exceeds defendant's ex-

---

[3] Defendant may gain further assets on remand as part of an equitable division of plaintiff's post-separation earnings.

[4] Though no evidence was placed before the trial court as to the earning power of money safely invested, an appellate court may take judicial notice of matters which

could have been judicially noticed by the trial court. 5 American Jurisprudence 2d (1962) 184, Appeal and Error, Section 739. Defendant suggests a 6.5 percent per annum interest rate at area financial institutions, a rate which this court notices as a conservative estimate of earning power in the area as of December 1986, the month of

penses. Pursuant to *Wolfe,* the amount of alimony awarded, when coupled with defendant's anticipated annual income and her large reservoir of assets, was sufficient to meet the reasonably anticipated needs of defendant.

Defendant relies on *Kaechele* v. *Kaechele* (Nov. 13, 1986), Franklin App. No. 86AP-263, unreported, for the proposition that a decree which leaves the dependent spouse with only seventeen percent of the couple's post-divorce disposable income is inequitable. That decision, however, did not so hold and was reversed in part by the Supreme Court. *Kaechele* v. *Kaechele* (1988), 35 Ohio St. 3d 93, 518 N.E. 2d 1197. Therein, the Supreme Court stated:

"* * * [W]e do not interpret R.C. 3105.18 to require an alimony award that provides the parties with an equal standard of living or a standard of living equivalent to that established during the marriage. *Sustenance alimony is based on need,* and the trial court must have latitude to examine all the evidence before it awards an amount that is reasonable and equitable to both parties." (Emphasis added.) *Id.* at 95, 518 N.E. 2d at 1200.

Further, it was noted:

"* * * [A]ll the statutory factors must be considered. The goal is to reach an equitable result. The method by which the goal is achieved cannot be reduced to a mathematical formula. * * *" *Id.* at 96, 518 N.E. 2d at 1200.

Accordingly, the parties' post-decree disposable income, although a factor, should not be unduly emphasized to the exclusion of such factors as the separate wealth and expectancies of the parties. Rather, absent extraordinary circumstances, the most that a party is entitled to from sustenance alimony is to maintain the standard of living established during the marriage. As we discussed *supra,* the alimony award herein is sufficient to permit defendant to maintain that standard of living indicated by her evidence of monetary requirements. The fact that plaintiff may be able to maintain a much higher standard of living after the divorce is not significant if the defendant is able to maintain the standard established during the marriage.

Moreover, the court properly took into account the defendant's receipt of social security benefits in approximately six years, as well as the possibility that within six years defendant could be receiving an $11,000 per annum pension, and an inheritance. Although neither the pension nor the inheritance was in any way certain to be available within six years, defendant's substantial assets, producing over $35,000 per annum in income, could allow the trial court to conclude that the defendant would not want if the pension and inheritance were not received until some later time. Given the foregoing, the sustenance alimony set by the court was reasonable and the trial court did not abuse its discretion in so determining.

Accordingly, defendant's fourth assignment of error is overruled.

In summary, defendant's first and second assignments of error are sustained, and the third and fourth assignments of error are overruled. The judgment of the trial court is reversed in part and affirmed in part, and the cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed in part,*
*affirmed in part,*
*and cause remanded.*

WHITESIDE, P.J., and MCCORMAC, J., concur.

---

the trial court's written decision. A rate of 6.5 percent yields over $35,000 annually on a principal of $550,000.