DILL, Appellee,

v.

DILL, Appellant.

[Cite as *Dill v. Dill*, 179 Ohio App.3d 14, 2008-Ohio-5310.]

Court of Appeals of Ohio,
Third District, Logan County.

No. 8–08–02.

Decided Oct. 14, 2008.

Sheila E. Minnich, for appellee.

Steven R. Fansler, for appellant.

PRESTON, Judge.

{¶ 1} Defendant-appellant, Robert E. Dill Jr., appeals the Logan County Common Pleas Court, Domestic Relations Division, judgment of divorce granted in favor of plaintiff-appellee, Tina K. Dill. For the reasons that follow, we reverse.

{¶ 2} Robert and Tina were married on September 8, 1973. Two children were born as issue of the marriage, both of whom are now emancipated: Tyler and Brian. Around 1995, Tina suspected that Robert was having an extramarital affair, and Robert expressed his desire to leave the home. In July 1995, Robert told Tina, "Oh, I don't know if I want to be here. I don't know." Tina "threw [Robert's] clothes in the middle of the floor and * * * said, 'Fine. You don't want to be here, then get out.'" Robert moved out that same day and moved in with his sister. Robert and Tina have lived in separate residences since July 1995.

{¶ 3} Shortly after Robert left in July 1995, Tina consulted an attorney about possible legal proceedings; however, the attorney advised Tina to "wait and see what happens * * * how it works out." Neither party took further legal action until February 28, 2005, when Tina filed a complaint for divorce. On October 26, 2005, the matter proceeded to final hearing. Thereafter, the parties submitted posttrial briefs and closing arguments.

{¶ 4} On January 31, 2008, the trial court issued its final judgment granting the divorce, dividing the marital assets, and awarding spousal and child support. For purposes of property division and spousal support, the trial court found that the marriage terminated on October 26, 2005, the date of the final hearing.

{¶ 5} On February 27, 2008, the trial court issued a nunc pro tunc judgment entry correcting a miscalculation of spousal support that appeared in its January

31 entry. On February 28, 2008, Robert appealed and asserts three assignments of error for review.

## Assignment of Error No. I

The trial court should have utilized a de facto termination date of the marriage rather than the date of trial.

{¶ 6} In his first assignment of error, Robert argues that the trial court abused its discretion by failing to utilize July 1995, the date of separation, as the de facto termination of marriage date instead of the date of the final hearing, October 26, 2005, for purposes of property division. Robert argues that using the October 26, 2005 date is inequitable because the parties had been separated for ten years, never attempted reconciliation, and lived separate lives. Robert further argues that the use of this date is especially inequitable because he has already paid Tina $1,500 to $1,600 per month in spousal and child support during the ten years of separation, and he is 58 years old and planning on retiring from his current work of climbing telephone poles due to his age and declining physical strength. We agree.

{¶ 7} Tina, on the other hand, argues that the trial court did not abuse its discretion in using the date of the final hearing as the marriage termination date because Robert and she were still acting as husband and wife. In support of this assertion, Tina points out that (1) Robert was providing for her and the children financially, (2) the utility bills for the home where she and the children resided were in Robert's name, and he gave her money to pay those bills, (3) they took out a home equity loan to pay off their first mortgage on the marital residence and pay off various other debts, (4) Robert and she had joint checking, savings, and credit card accounts and filed income tax returns jointly every year following their separation, (5) Robert and she engaged in sexual relations at least three times during the separation, (6) Robert came over to visit her and the children every Saturday and during Christmas, and (7) she never wanted the marriage to end and was willing to reconcile until the date of the final hearing.

{¶ 8} Our analysis will be four-fold. First, we will examine the relevant rules of law; second, we will examine the relevant facts and circumstances of this case; third, we will examine the trial court's ruling; and fourth, we will apply the applicable rules of law to the facts and circumstances of the case.

### 1. Rules of Law

{¶ 9} R.C. 3105.171(A)(2) provides:

(2) During the marriage means whichever of the following is applicable:

(a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;

(b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

Traditionally, a marriage ends on the date of the final hearing. *Fisher v. Fisher* (Mar. 22, 2002), 3d Dist. No. 7–01–12, 2002 WL 444904, at *2, citing R.C. 3105.171(A)(2); *Eberly v. Eberly* (Jun. 13, 2001), 3d Dist. No. 7–01–04, 2001 WL 651441. "However, if the trial court determines that the date of the final hearing would be inequitable and that a de facto termination of the marriage occurred at an earlier time, the trial court has the discretion to select dates that it considers equitable in determining marital property." Id., citing R.C. 3105.171(A)(2)(b); *Heary v. Heary* (Nov. 30, 2000), 8th Dist. Nos. 76833, 77049 and 78180, 2000 WL 1754003, citing *Gullia v. Gullia* (1994), 93 Ohio App.3d 653, 666, 639 N.E.2d 822.

{¶ 10} R.C. 3105.171(A)(2)(b)'s language is discretionary, not mandatory; and therefore, the trial court's decision of whether a de facto termination date is equitable is reviewed under an abuse-of-discretion standard. Id., citing *Berish v. Berish* (1982), 69 Ohio St.2d 318, 23 O.O.3d 296, 432 N.E.2d 183. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 11} A de facto termination of marriage must be "clear and bilateral, not unilateral;" thus, the "unilateral decision" of one spouse to leave the marital residence does not, in and of itself, constitute a de facto termination of marriage. *Day v. Day* (1988), 40 Ohio App.3d 155, 158, 532 N.E.2d 201. Several factors should guide a trial court when determining whether a de facto termination of marriage date is equitable, including, but not limited to whether (1) the parties separated on less than friendly terms, (2) the parties believed the marriage ended prior to the hearing, (3) either party cohabited with another person during the separation, (4) the parties were intimately involved during the separation, (5) the parties lived as husband and wife during the separation, (6) the parties maintained separate residences, (7) the parties utilized separate bank accounts or were/were not financially intertwined (with the exception of temporary orders), (8) either party attempted to reconcile, (9) either party retained counsel, and (10) the parties attended social functions together or vacationed together. *Rogers v. Rogers* (Sept. 2, 1997), 10th Dist. Nos. 96APF10–1333 and 96APF01–67, 1997 WL

559479, at *5–6, citing *Hamblin v. Hamblin* (Oct. 18, 1993), 12th Dist. Nos. CA93–03–044 and CA93–03–048, 1993 WL 414253; *Murphy v. Murphy* (June 22, 1988), 9th Dist. No. 2345, 1988 WL 66915; *Pearson v. Pearson* (May 20, 1997), 10th Dist. No. 96APF08–1100, 1997 WL 275496. *Mantle v. Sterry,* 10th Dist. No. 02AP–286, 2003-Ohio-6058, 2003 WL 22681343, ¶ 12. No one factor is dispositive; rather, the trial court must determine the relative equities on a case-by-case basis. *Berish,* 69 Ohio St.2d at 319–320, 23 O.O.3d 296, 432 N.E.2d 183.

{¶ 12} Generally, a trial court's determination of whether to utilize a de facto termination of marriage date is upheld on appeal. The court of appeals has, however, held that a trial court abuses its discretion by failing to use a de facto termination-of-marriage date when the parties have (1) separate residences, (2) separate business activities, (3) separate bank accounts, and (4) made no attempt at reconciliation. *Gullia,* 93 Ohio App.3d at 666, 639 N.E.2d 822. See also *Rogers,* 10th Dist Nos. 96APF10–1333 and 96APF01–67, 1997 WL 559479, at *7; *Crowder v. Crowder* (Aug. 5, 1999), 10th Dist. No. 98AP–1124, 1999 WL 569277; *Zimon v. Zimon,* 9th Dist. No. 04CA0034–M, 2005-Ohio-271, 2005 WL 156726. As this court has noted before, the one common factor among the cases reversed on appeal was that "a great deal of time elapsed between the date of separation and the date of the final hearing." *Fisher,* 3d Dist. No. 7–01–12, 2002 WL 444904, at *4 (noting that Rogers involved a four-year disparity between separation and trial; *Gullia* involved a three-year disparity between separation and the filing of the divorce complaint; and *Crowder* involved a seven-year disparity between separation and the filing of the divorce complaint); *Crouso v. Crouso,* 3d Dist. No. 14–02–04, 2002-Ohio-3765, 2002 WL 1727391, ¶ 9 ("the rare cases where an abuse of discretion was found, the facts indicated a significant time lapse between separation and final hearing").

### 2. *Relevant Facts and Circumstances*

{¶ 13} After moving out in July 1995, Robert's relationship with Tina changed, though the parties' recollection of the circumstances of their relationship varies. According to Tina, although Robert maintained a separate residence, practically, they functioned as a family. Robert would visit with Tina and his two sons on Saturdays and during Christmas. On these Saturday visits, Robert would take his family, including Tina, to dinners and movies. Tina recalled that Robert would occasionally stay the night at her house, though she could not remember the last time. Tina testified that Robert and she were intimate on more than three occasions during the separation, and the last time occurred around the end of February or beginning of March 2004.

{¶ 14} Tina testified that she had asked Robert to move back home; Robert acknowledged that he had thought about it, but he did not make any effort to

return home. Tina also testified that Robert and she never sought or discussed marriage counseling because "[i]t just wasn't something that I thought we needed or I thought he would do." However, Tina did "go and talk to * * * a couple preachers." Tina also testified that "initially" when Robert left, she consulted with an attorney, but the attorney told her to "just wait and see what happens * * * how it works out." Tina testified, "[B]asically, when he left, I fought back."

{¶ 15} Tina testified that during the separation, Robert and she maintained joint checking and savings accounts; Robert gave her money to pay utility bills because they remained in his name; and Robert and she jointly filed federal tax returns as "married" and split the refund equally. Tina acknowledged, however, that during the separation, Robert opened his own checking account; she accumulated debt on several credit cards, which were in her name only; and she purchased a car without Robert's help. Tina also testified about the home-equity loan Robert obtained on the marital home:

Q: Okay. Now what about during the period of time that you were separated. Was there any debt that was incurred? Did your husband refinance the house?

A: He took out a home equity loan.

Q: Okay.

A: To pay—to pay for a Blazer that he bought. I know he used it for that. I am not sure what else he used it for. And then in January 2004, and we had discussed whether he should use some of the home equity loan to pay off Citizens Federal so that the interest rate would be about half of what we were paying. January of 2004, he came to me and asked if we could do that. And—

Q: Now what was Citizen's Federal? Was that a mortgage?

A: Citizen's Federal held the mortgage for the house, yes.

Q: Okay. So he came and talked to you about: *What do you think about refinancing?*

A: Yeah.

Q: Okay. At that time then, you talked about it. He went and got the loan. You signed the papers. Is that correct?

A: He asked me if he could do that. And I thought about it and I thought okay, we are still together. I think we are going to be together. So I signed off the house so Citizen's Federal could release it. And paid. And he could take out the equity loan to pay the loan off at Citizen's Federal.

Q: Okay. At the time he moved out of your home, how much was owed on the mortgage?

A: At the time he moved out? Probably * * *

\* \* \*

A:  I don't—he had the book and he made the mortgage payments.

Q:  Okay.

A:  I really don't know how much was owed when he left.

\* \* \*

Q:  Okay.  And did you sign on that home equity loan?

A:  No.

Q:  Okay.  You had to sign papers, though, correct?

A:  The only papers I signed was agreeing to let him use the house as collateral to pay off Citizen's Federal loan and move it over to that loan.

Q:  And would you have done that had you have known you were going to be here today?  Not thinking—

A:  No.

Q:  —thinking your marriage was going to—

A:  No, I wouldn't have.

{¶ 16} While Tina was testifying about the home-equity loan, Robert prepared an itemized list of his expenditures from the loan's proceeds on a piece of paper. Robert's attorney gave the list to opposing counsel.  The list contained the following items:

| | |
|---|---:|
| old truck pay off | 5660.31 |
| new truck purchase | 15045.00 |
| taxes | 2500.00 |
| credit card | 4948.06 |
| Auto Ins. & home | 4563.46 |
| Attorney | 2200.00 |
| truck repair water pump oil lines | 649.84 |
| home pay off | 19000.00 |

When asked if the list was a fair and accurate representation of what the home-equity-loan funds were used for, Tina responded, "The only thing I was actually aware of, was the home pay off."  When counsel asked about whether Tina was aware that Robert was using the loan proceeds to pay off his old truck, Tina responded, "He traded vehicles, so yeah, that is very possible there was a balance on the old one."  Tina testified that she was, however, aware that Robert used the loan proceeds to purchase a new truck.  Tina further testified:

Q:  He's also got on here he paid taxes.  I believe Mr. Fansler indicated it was for the real estate.  Do you think he used that for around 25 hundred to pay on the real estate taxes?

A: It's possible he did.

Q: Okay.

A: He also had a savings account he got money out of for that purpose, so I really don't know.

Q: Not real sure? What about he's got credit cards 4,948. Are you aware of a credit card?

A: No.

Q: Okay. He's also got auto insurance and home that he paid 4,563.46 on. Are you familiar with him paying that?

A: It would be the same case as the taxes. I know that he did give me a check. He gave me a check once to use for that account. And it's very possible that he gave * * * where he got the money that he gave me, he took from there. I really don't know.

Q: Okay. Then he's got attorney, $2,200. Obviously that was not for your attorney. Correct?

A: No.

Q: Then he's got truck repair, water pump and oil line, 649.84. Did you know anything about that?

A: No.

{¶ 17} Tina testified regarding the payments she received from Robert during the separation. Tina acknowledged that Robert gave her around $450 biweekly until Tyler, the oldest son, graduated and, for several years after that, Robert gave her $300 biweekly. Tina testified as to why she received these payments:

Q: * * * Was it your understanding that this 450 a month and 300 a month, it drops down once your oldest son graduated?

A: Yes.

Q: Is that what you said?

A: Um-hum.

Q: So was it more of a * * * child support? More for the support of the kids?

A: That's—when I filled out Tyler's financial aid, that is what I said it was child support, yes.

Tina also testified that Robert paid "the biggest share of the [real estate] taxes," Tyler's car insurance, the mortgage, and most of the homeowner's insurance.

{¶ 18} On cross-examination, Tina admitted that Robert left the home in July 1995 because she told him to leave. Tina also testified that she had sexual relations with Robert more than three times during the separation but could not give a definite number. Tina confirmed that Robert and she never sought

marriage counseling following the separation. Tina also testified that she purchased a car without Robert's opinion and without his cosigning the loan. Likewise, Tina testified that although she went with Robert to look at his Blazer before he purchased it, she told him "to do whatever he wanted to do."

{¶ 19} Regarding the joint checking account, Tina testified that Robert does not have a checkbook, never had a check book, and never drafted a check on the account. Tina testified that Robert has never told her how to spend her money, nor has she told him how to spend his money. As to the joint savings account, Tina testified that she does not know if a savings account book exists but did withdraw funds to pay homeowner's insurance. Tina also testified that her name is not on any of Robert's new bank accounts, the utility bills are in Robert's name, and the phone listing at the marital home is in her name only.

{¶ 20} Regarding the home-equity loan, Tina admitted that she did not have anything to do with obtaining it, except signing the papers to release the first mortgage. Furthermore, Tina testified that she did not sign the loan's promissory note and that Robert that spent the money as he pleased. Tina testified that the deed to the marital home is in Robert's name only. Tina testified that she is not on Robert's new credit cards, but she did use a joint National City bank card "for several years."

{¶ 21} Tina also clarified how she declared the money given to her by Robert on their son's federal financial aid application:

Q: * * * You said that when you filled out financial aid for your son, you called it child support. Was there a line that specifically asked for child support received?

A: Um * * * there was a section that had—I either filled it in as child support or I filled it in as other.

Q: Okay.

A: I called them and asked them how I should do it.

Q: Okay. Did you put Bob's income down on your financial aid form?

A: No, I did not.

Q: You signed that form under oath, a federal form. Correct?

A: I filled it out and signed it the way the federal—the way they told me to fill it out.

* * *

Q: You know you signed that form under oath? Correct?

A: Yes.

Q: And you are the one that filled it out? Correct?

A: Yes.

Q: Is the information in it true and accurate?

A: Yes.

Q: All right. On the federal financial aid form to get your son financial aid, you did not disclose his income as your household income? Did you?

A: No. Because I wasn't required to.

Q: And you refer to the money that he paid you, either as other or child support. Correct?

* * *

A: I either put it in there as child support, or I put it in there as other. I'm not sure. I'd have to go look at the form and see. Because I was unsure really as to how to put it in there. But yes, I included it.

{¶ 22} On redirect examination, Tina testified that she and Robert discussed obtaining the home-equity loan because the interest rates were low; however, Robert obtained the paperwork and had her sign it. Tina testified that sexual relations had last occurred in a shower; they "kissed" and "fondled" each other but that, ultimately, Robert was unable to have intercourse. Tina testified that Robert never asked her to remove his name from the joint checking account. With regard to her withdrawal of funds from the joint savings account, Tina testified that she "didn't think [Robert] appreciated that [she] did it."

{¶ 23} On recross, Tina testified that she first accessed funds in the joint savings account after nine years of separation without asking Robert because at that time, "[she] wasn't talking to him." Tina also testified that Robert "didn't like it very much" and that he immediately changed the account to prevent her from withdrawing funds again.

{¶ 24} Robert, on the other hand, testified that he has not used the joint checking account since July 1995, and that he forgot his name was on the account. Robert explained that he has never received a checking account statement, he never drafted checks on the account, and has never made any withdrawals from the account. As to the joint savings account, Robert testified that he was upset that Tina had withdrawn money without his permission, so he removed Tina's name from the account. Robert also testified that he has opened new credit cards in his name only; he does not have the joint National City credit card [1] that Tina used; and he has never used or made payments on the National City card. Robert testified that he did not cosign for Tina's car loan, nor did Tina cosign for his truck loan. With regard to the home-equity loan, Robert testified that it is in

---

1. Whether the "National City bank card" is a debit card linked to the parties' joint checking account or whether it was a separate credit card is unclear from the testimony. Tina referred to the card as a "bank card," whereas Robert referred to it as a "credit card." The trial court refers to the card as a "credit card" as well.

his name only;  Tina did not apply for it;  and he decided how to spend the proceeds.

{¶ 25} Robert also testified concerning the money he paid Tina during the separation:

Q:  What payments have you made to her through the years?  Let's start with cash payments.  What do you believe happened through the years about cash payments since July of 1995?

A:  I paid her since I wasn't there * * * help for child support, things like that—

Q:  Okay.

A:  —help them over the years.

Q:  July of 1995 until Tyler graduated, do you know how much money you paid her per month?

A:  Yes, around $900.

Q:  900 a month?

A:  Yes.

Q:  And did you do it every month for those six years?

A:  Yes.

Q:  Was there any court order that you were aware of that, or told you to do it?

A:  No.

Q:  Why did you make those payments?

A:  I felt responsible for the boys' well being.

Q:  What did you think of those payments as being?

A:  Child support.

Q:  Okay.  In addition to the 900 per month for those 6 years, what other payments were you making to her, or on her behalf for those 6 years?

A:  Property taxes.  House insurance.  Some of our insurances.

Q:  And did you pay whatever house payment—or house related payment all through those times?

A:  Yes.

Q:  How much per month did you pay in addition to the 900 a month from 95 to 2001?

A:  With the house payment, I'm trying to figure with the taxes it would be monthly—probably 6–7–800 extra more per month.

Q:  Okay.

A:  It strapped me sometimes.

Q: Okay. When Tyler graduated in 2001—is that right? She said 2001, didn't she?

A: I think.

Q: From 2001 until now, how much has the monthly cash payment been?

A: 600.

Q: And have you done that every month?

A: Yes.

Q: In addition to the 600, have you continued making the other payments?

A: Yes.

{¶ 26} Robert also testified that they filed joint/married tax returns in order to "get the most money back." Robert further testified that Tina and he have never sought marital counseling; he never consulted clergy; he never took any steps toward reconciliation; he has not lived in the marital home since July 1995; and that Tina has never paid any of his bills. Concerning sexual intimacy with Tina, Robert testified that since July 1995, it happened "[c]ouple 3 times is all," and the last time was around seven years ago. Robert testified that he was living with another woman and that Tina admitted to having extramarital relations as well. Robert testified that the family has not taken any vacations together since July 1995, even though the family took yearly vacations before July 1995. Robert testified that he visited with his son Brian on Saturdays, and that Tina went with them a couple times because he was trying to be nice.

{¶ 27} On cross-examination, Robert testified that he pays $400 a month rent to the woman with whom he now resides. Robert also testified that at one point, the woman moved into his sister's house with him, but now owns a house where they live together. With regard to the last intimate occasion with Tina, Robert testified that he "got in the shower with her. We kissed. And that was about it. And I got out." Robert admitted to spending Christmas at the marital home for the past 31 years, opening gifts with his sons and Tina and having breakfast together. Although he could not recall specifically, Robert admitted that he may have stayed overnight one Christmas Eve night. Robert also testified that he may have stayed overnight in 2001 so that he could take Tina and Brian to the airport in the morning for a trip to Disney world. Robert could not recall whether he stayed in the same bed as Tina that night and testified: "I might have stayed on the couch. I don't remember staying in the bed." Robert also testified that during the summer of 2003, Tina and he moved Tyler to college in Chicago and that Tina and he shared a hotel room.

### 3. *Trial Court's Ruling*

{¶ 28} The trial court stated the relevant facts upon which it relied for its determination of whether a de facto termination of marriage had occurred in its entry as follows:

In the instant case, it is irrefuted that the parties separated in 1995, and that for the most part they lived in separate locations and had minimal contacts involving sexual intimacy, which according to the case law would support the Defendant's argument of a *de facto* termination of marriage. There are however other actions and activities that tend to blur that line. The Plaintiff offered credible testimony that although she, in an angry moment, asked him to leave, she did not want the marriage to end at the time of that separation. She and the Defendant continue to have regular weekly activities involving the children. Mr. Dill continued to participate in Christmas activities at the marital residence. The marital residence continued to be treated as a marital asset, securing a home equity loan, which required Plaintiff to sign a release of her dower interest and increased the indebtedness, and decreased the marital equity in that premises. The actions of both parties in the transaction, in the Court's opinion, are significant marital actions. The Defendant depleted a marital asset, his 401(k), for living expenses. In addition, neither party took any steps to remove either one's name from the joint checking account or joint savings credit union account during the entire period of "separation." The Plaintiff made no effort and took no steps to secure her interest in the marital value of the residence nor did the defendant take such steps as would have removed the necessity of securing the Plaintiff's release of dower upon refinancing, such as filing of a divorce action. Further no effort was made by either party to remove the Defendant's name or obligation from the joint credit card, even though he chose not to use it, the Defendant still had a financial responsibility thereon, since it was acquired prior to the "separation."

At no point in the trial court's entry did it indicate that Tina's or Robert's testimony was more or less credible than the other's. The trial court apparently treated all testimony as credible but ultimately concluded that "the actions of the parties were certainly not clear, and not bilateral, and therefore, no *de facto* termination of marriage occurred prior to the date of the final divorce hearing," relying upon the rule in *Day,* 40 Ohio App.3d at 158, 532 N.E.2d 201.

### 4. *Appellate Review*

{¶ 29} As previously noted, we review the trial court's decision under an abuse-of-discretion standard. *Fisher,* 3d Dist. No. 7–01–12, 2002 WL 444904, at *2, citing *Berish,* 69 Ohio St.2d 318, 23 O.O.3d 296, 432 N.E.2d 183. An abuse of discretion suggests that the trial court's decision is unreasonable, arbitrary, or

unconscionable. *Blakemore*, 5 Ohio St.3d at 219, 5 OBR 481, 450 N.E.2d 1140. Upon review, we conclude that the trial court erred.

{¶ 30} Our conclusion that the trial court erred rests upon three primary premises: (1) the trial court failed to appropriately consider several factors favoring de facto termination of the marriage, (2) the trial court incorrectly applied the *Day v. Day* rule, and (3) the trial court's decision affronts the sense of justice, decency, and reasonableness.

{¶ 31} First, the trial court failed to appropriately consider several factors when determining whether a de facto termination of marriage was equitable. In concluding that a de facto termination of the marriage did not occur, the trial court emphasized several factors: (1) Tina's desire to continue the marriage, (2) Robert's regular weekly visits with his sons, (3) Robert's time at the home on Christmas day, (4) the home-equity loan, and (5) the joint credit card, checking, and savings accounts. While we do not dispute that some of these are relevant factors to consider, they can not sustain the trial court's ruling here.

{¶ 32} The trial court found that "[p]laintiff offered credible testimony that although she, in an angry moment, asked [Robert] to leave, she did not want the marriage to end at the time of that separation." Although Tina did testify that she did not want the marriage to end on the date of the separation, the parties' actual reconciliation efforts were *minimal*. See *Rogers*, 10th Dist. Nos. 96APF10–1333 and 96APF01–67, 1997 WL 559479, at *7. Neither party sought marital counseling, though Tina did "go and talk to * * * a couple preachers." *Pearson*, 10th Dist No. 96APF08–1100, 1997 WL 275496, at *5 (whether the parties attempted to reconcile is a factor); *Gullia*, 93 Ohio App.3d at 666, 639 N.E.2d 822 (same). When asked if she thought that the marriage was fine after the July 1995 separation, Tina responded, "Yeah, I guess." Tina also testified that when Robert left, she consulted with an attorney, testimony that tends to indicate that Tina, contrary to her testimony, believed that Robert's leaving affected the marriage. *Murphy*, 9th Dist. No. 2345, 1988 WL 66915, at *2 (party's retention of counsel is a factor). Robert testified that neither of them attempted to reconcile. Ultimately, Tina's only effort at reconciliation was telling Robert that she would like him to move back home, which Robert declined to do. Tina also acknowledged that Robert took no efforts to return home. The trial court's emphasis on Tina's intent or desire to maintain the marriage was misplaced; rather, the trial court should have focused on the objective evidence of reconciliation, which was minimal here. See *Rogers*, 10th Dist. Nos. 96APF10–1333 and 96APF01–67, 1997 WL 559479, at *7 (noting that party introduced "minimal evidence of reconciliation"). Under these circumstances, the trial court's reliance on this factor was inappropriate.

{¶ 33} The trial court's reliance on Robert's visitation with Tina and their sons is also problematic. Although Tina testified that they were functioning like a family in part because Robert was visiting every Saturday, Tina's testimony must be read in the context of the question asked. (Oct. 26, 2005 Tr. at 26–27). Tina was asked: "[D]id you still function as a family as far as *for your children's benefit*?" (Emphasis added). Accordingly, Tina's response was not about reconciliation but, rather, about how Robert and she made time for the children. Likewise, Robert testified that he was visiting his sons "pretty much when [he] wanted to" and included Tina "just to be nice." Robert also testified that Tina and he never discussed reconciling during his visitation time.

{¶ 34} We are also not persuaded that Robert's visitation with his sons and Tina on Christmas Day was evidence of reconciliation or that the marriage was continuing. Robert testified that he "would come bring the boys their stuff for a couple hours on Christmas day and leave." The fact that Robert was visiting his sons and spending time with them does not show his effort to reconcile with Tina, nor does it show that the marriage was ongoing; instead, it simply demonstrates Robert's commitment to a relationship with his children.

{¶ 35} The trial court's reliance on the home-equity loan is similarly problematic. The trial court found that "[t]he actions of both parties in the transaction, in the Court's opinion, are significant marital actions." The testimony presented at the hearing, however, indicates that Tina had very little involvement in securing the equity loan or deciding how to use the proceeds. Essentially, Tina's involvement consisted of signing a release of her dower interest. Tina did not obtain the loan, sign the promissory note, know how Robert spent the loan proceeds—except for the Blazer purchase and paying off the first mortgage—or know the equity loan terms and conditions.

{¶ 36} The trial court's reliance upon the joint credit card, checking, and savings accounts is also less than persuasive in this case. With regard to each of these accounts, each party regarded the account in his or her possession as his or her personal account even though the other spouse's name remained. Tina had in her possession the joint credit card and checking accounts. Both parties testified that Robert has never had the checkbook and had never drafted any checks on the account or even received account statements. Furthermore, Robert never had access to the joint credit card and had never received statements from that account.[2] When asked why he allowed his name to remain on these accounts, Robert testified that he forgot that his name was on them.

---

2. In addition, if the "National City Bank card," as Tina called it, was a debit card linked to the parties' joint checking account and not a credit card, then this is not a separate comingled account, as the trial court suggested. See note 1.

Robert had in his possession the joint savings account. Tina did not have the bank book and did not withdraw funds until nine years after their separation. When Tina did withdraw funds, Robert was angry and immediately removed Tina's name from the account. In addition, since the separation, Robert and Tina have opened new checking and credit card accounts in their separate names only. The fact that Robert and Tina had joint accounts was relevant to the trial court's determination; however, what was more relevant and dispositive is the fact that each party treated the accounts in his/her possession as individual accounts, not joint accounts. Under these circumstances, we are not persuaded that the joint accounts demonstrated that the marriage continued during the separation.

{¶ 37} Aside from the fact that the trial court failed to fully consider the relevant factors as discussed above, the trial court also failed to consider factors that favored a de facto termination date. The trial court failed to consider that both parties have engaged in extramarital relations, and Robert was cohabiting with another woman. *Rogers,* 10th Dist Nos. 96APF10–1333 and 96APF01–67, 1997 WL 559479, at *7 (party's extramarital affair is a factor); *Hamblin,* 12th Dist. Nos. CA93–03–044 and CA93–03–048, 1993 WL 414253 (cohabitation with another is a factor). Robert testified that at the time of the hearing, he had been cohabiting with another woman and her children for 15 months. Robert also testified that Tina had admitted to him that she had had an extramarital relationship during the separation. The trial court also failed to consider that the parties had not vacationed together since July 1995, when the parties separated, but had previously vacationed together every year before July 1995. *Sterry,* 2003-Ohio-6058, 2003 WL 22681343, at ¶ 12.

{¶ 38} The trial court failed to consider Tina's federal financial-aid-application declarations. Tina declared that her income was the only "household" income and that Robert's payments to her were either "child support" or "other" income. Since the trial court's de facto termination decision was an equitable one, Tina should have been estopped from arguing that she and Robert remained married after the financial aid application's date—at the latest.[3]

{¶ 39} The trial court also failed to consider the significance of the manner by which Robert paid Tina support. Both Tina and Robert testified that the payments were cash payments. According to Tina, Robert would "get his paycheck and cash it." The fact that Robert cashed his paycheck and gave Tina a cash payment, rather than depositing it directly into the joint checking account,

---

**3.** We are also aware that the parties have filed joint/married income tax returns as recently as 2004, and this fact could indicate that the parties held themselves out as "married" for tax purposes. However, we do not find the income tax returns as persuasive as the federal financial aid declarations, because Robert and Tina were *legally* married and, thus, required to file as married, though not necessarily jointly.

further indicates that the parties' finances were separate. *Schwendeman v. Schwendeman* (Feb. 25, 2000), 4th Dist. No. 99CA15, 2000 WL 249255, at *6. This conduct also indicates that the parties were acting as if the marriage had already terminated and that Robert's cash payments were support payments.

{¶ 40} The trial court also failed to consider the fact that Tina and Robert purchased vehicles without each other's consent and financial support. See *Soulsby v. Soulsby*, 4th Dist. No. 07CA1, 2008-Ohio-1019, 2008 WL 623952, ¶ 30 (wife's unilateral decision to sell couple's mobile home and furnishings and retain proceeds without husband's consent was relevant evidence to support trial court's equitable termination-of-marriage date). Robert testified that he did not cosign for Tina's car loan, nor did Tina cosign for his truck loan. Tina testified to the same fact and further indicated that she had purchased her car without Robert's opinion, and Robert had purchased his Blazer without her consent. The fact that the parties were purchasing expensive personal property separately indicates that the parties were no longer acting as husband and wife.

{¶ 41} This case is factually similar to *Rogers v. Rogers* (Sept. 2, 1997), 10th Dist. Nos. 96APF10–1333 and 96APF01–67, 1997 WL 559479. As in this case, the husband had left the marital residence after his wife discovered that he was having an extramarital relationship and asked him to leave. Id. at *3, 7. The wife filed for divorce in October 1991, but the final hearing did not take place until November 1995—more than four years later. Id. at *1–2. For purposes of property distribution, the trial court valued the parties' assets and liabilities as of the final hearing date. Id. at *3. During the separation period, the parties, unlike those herein, attempted a short period of marital counseling, though that was ultimately unsuccessful. Id. at *7. Like the parties herein, the husband did not reside at the marital home during the separation; however, unlike the parties herein, the husband and wife were not intimate. Id. Like the parties herein, the husband and wife obtained separate bank accounts, but, unlike the parties herein, did not have remaining joint accounts. Id. Like the parties herein, the husband and wife demonstrated "minimal evidence of reconciliation," and both parties had extramarital relationships following the separation. Id. The Court of Appeals for the Tenth District held that "the foregoing facts clearly demonstrate that both parties intended that their marriage be over as of [the date of separation]" and reversed, concluding that the trial court had abused its discretion by not utilizing a de facto termination date. Id. We find Rogers instructive and, likewise, reverse for the trial court's reconsideration of an equitable de facto termination date for Robert and Tina's marriage.

{¶ 42} Second, the trial court incorrectly applied the rule in *Day*, 40 Ohio App.3d 155, 532 N.E.2d 201, to the facts of this case. The court in *Day* was presented with a husband who had vacated the marital residence unilaterally.

*Based on this fact alone*, the trial court concluded that "[a]ll property acquired by the parties after separation (i.e. *de facto* termination of the marriage) shall be regarded as non-marital property * * *." *Day*, 40 Ohio App.3d at 157, 532 N.E.2d 201. On appeal, the Tenth District determined that, by focusing on this one factor, the trial court "thereby set down a flat rule, based upon statutory and case law and not the facts of this case, that the permanent separation of the parties necessarily renders all property acquired thereafter not subject to equitable distribution. In so doing, the trial court put undue emphasis on the plaintiff's unilateral actions."

Id. at 157–158, 532 N.E.2d 201. Following this explanation, the court in *Day* stated:

> As plaintiff contends, there may be a *de facto* termination for alimony purposes prior to [the date of the divorce decree]. However, such *de facto* termination must be clear and bilateral, not unilateral, as here, and can be manifested by a written separation agreement under R.C. 3103.06. In this case, the record contains no clear evidence that would support a *de facto* termination on September 1, 1984, the date plaintiff vacated the marital residence, as plaintiff's unilateral action is insufficient herein to achieve that end.

From this later passage, courts, including this one, have gleaned that a "*de facto* termination must be clear and bilateral, not unilateral." See, e.g., *Connolly v. Connolly* (1990), 70 Ohio App.3d 738, 746, 591 N.E.2d 1362; *Dunlap v. Dunlap* (Mar. 27, 1996), 1st Dist. Nos. C–940033 and C–940050, 1996 WL 134543, at *10; *Fisher*, 3d Dist. No. 7–01–12, 2002 WL 444904, at *3; *Schwendeman*, 4th Dist. No. 99CA15, 2000 WL 249255, at *6. The rule has two requirements: that the de facto termination is both "clear" and "bilateral."

{¶ 43} The requirement that the de facto termination is "clear," however, must be interpreted in light of the fact that the trial court in *Day* relied upon only one factor—the husband's unilateral decision to leave the marital home—to conclude that a de facto termination of the marriage had occurred. Under those circumstances, the appellate court held that the de facto termination was not "clear." As we have explained above, this case involves much more than any one action alone. On the basis of our previous discussion in premise one, we cannot agree with the trial court's conclusion that the de facto termination here was not "clear" as required by the rule in *Day*.

{¶ 44} We also cannot agree with the trial court's finding that the parties' separation was unilateral. The trial court reached this conclusion even though it found that Robert left *because Tina told him to leave*. Unlike the husband and wife in *Day*, the decision to live separately was made by both Tina and Robert. Tina explained:

I was going through my emotions, and my hormones were going crazy. I didn't know what was going on. When I finally went to the doctor, I was treated for P.M.S. And then he just—he just wasn't there for me. I finally realized there was someone else that he was seeing. And it just got to the point I couldn't take it anymore when he would come home and * * * *Oh, I don't know if I want to be here.* I don't know. It was just one of those days when things weren't going right. I threw his clothes in the middle of the floor and I said, *Fine. You don't want to be here, then get out.*

After Tina told Robert to leave, he left and never again lived in the marital home. Under these circumstances, we cannot agree with the trial court's conclusion that the parties' separation was unilateral.

{¶ 45} Accordingly, we cannot but conclude that the trial court failed to properly apply *Day*'s rule to the facts of this case.

{¶ 46} Third, the trial court's decision affronts this court's sense of justice and decency and is otherwise unreasonable in light of the facts of this case. To begin with, this case involves a 10–year disparity between separation and final hearing. As this court has noted, a substantial length of time between separation and final hearing weighs in favor of de facto termination. *Fisher*, 3d Dist. No. 7–01–12, 2002 WL 444904, at *4; *Crouso*, 2002-Ohio-3765, 2002 WL 1727391, at ¶ 9. Over these ten years, Robert has paid a substantial amount of spousal and child support, the mortgage, real estate taxes, and home insurance. In total, Robert was providing Tina with approximately $1,500 of support per month, even though he was never required to do so by court order. Robert has also maintained a relationship with his sons. Over these past ten years, Robert has continued to work full time and contribute toward his pension, while Tina has worked only part time. Meanwhile, Tina's health has deteriorated, which will result in more medical expenses and thus, a higher spousal support burden upon Robert. Robert is also near retirement and will soon be on a fixed income. Weighing all these equitable considerations, especially in light of the ten-year disparity between separation and final hearing, we hold that the trial court erred in its ruling.

{¶ 47} For all the aforementioned reasons, we find that the trial court abused its discretion by failing to utilize a de facto termination-of-marriage date. Although it is not clear that the marriage was terminated in July 1995, as Robert argues, the weight of the evidence established that the marriage did not continue until October 26, 2005—the date of the final hearing—as the trial court found. The weight of the evidence suggests a termination date in between these two extremes. Although this court is within its authority to determine the appropriate date, it is more appropriate that we defer to the trial court's judgment in these types of cases. Our analysis herein provides the trial court with the

relevant factors it should consider to determine an equitable termination date. We therefore reverse for the trial court to determine an equitable termination-of-marriage date.

{¶ 48} Robert's first assignment of error is sustained.

### Assignment of Error No. II

The trial court erred in taking 27 months to decide the case and then retroactively charging plaintiff [sic] spousal support at the rate of $1,044.39 per month for the entire 27 months, creating an immediate arrearage of $28,400.67.

### Assignment of Error No. III

The trial court erred in the amount of spousal support and abused its discretion based upon the statutory factors regarding spousal support.

{¶ 49} In his second and third assignments of error, Robert argues that the trial court erred in its calculation of spousal support by creating an immediate substantial arrearage and by failing to properly consider the relevant statutory factors. Because we have sustained Robert's first assignment of error with regard to the marriage-termination date, these assignments are rendered moot, as a recalculation will need to be made following remand.

{¶ 50} Robert's second and third assignments of error are, therefore, over-ruled.

{¶ 51} Having found error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court and remand for the following purposes:

1. determining an equitable de facto termination-of-marriage date; and

2. recalculating division of property and spousal support in light of its de facto termination-of-marriage date.

Judgment reversed
and cause remanded.

SHAW, P.J., and ROGERS, J., concur.